John Leelyn SEELY  *v.*  STATE of Arkansas

CR 07-1063                                    282 S.W.3d 778

Supreme Court of Arkansas
Opinion delivered April 10, 2008

*The Cannon Law Firm, P.L.C.,* by: *David R. Cannon,* for appellant.

*Dustin McDaniel,* Att'y Gen., by: *Vada Berger,* Ass't Att'y Gen., for appellee.

Robert L. Brown, Justice. Appellant John Leelyn Seely appeals his judgment of conviction for rape of his three-year-old daughter, for which he received a sentence of imprisonment as a habitual offender for a term of twenty years. He asserts a violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution due to the hearsay testimony of two witnesses against him. We affirm.

In September of 2005, Seely was living with his girlfriend, Suzette Barnes, and the couple's three-year-old daughter, J.B. On September 23, 2005, J.B. approached Barnes, complaining that her "booty" was hurting. Barnes explained that "booty" was the term that J.B. used to describe her vagina. Barnes cleaned J.B. with a washcloth and placed some Vaseline on the area, which appeared irritated.

About an hour later, J.B. again approached Barnes with complaints of pain, and Barnes applied more Vaseline. At bedtime, J.B. continued complaining of pain and asked to go to the doctor. This raised Barnes's concern, because J.B. was usually afraid to go to the doctor. Barnes said that she would take J.B. to the doctor if she was still in pain after school the next day. Barnes then asked J.B. if she could tell Barnes why her booty hurt. According to Barnes, J.B. responded, "Yes. My daddy did it." Barnes asked her what she meant and J.B. responded that her daddy had put his fingers in her booty and "dug" in her booty.

The same night, Barnes took J.B. to Arkansas Children's Hospital. Before J.B. was examined by a doctor, she was interviewed by Trish Smith, a social worker whose duties included interviewing children who were brought in for physical or sexual abuse. Barnes was present during the interview. After ascertaining that J.B. used the word "booty" to refer to her vagina, Smith asked J.B. if she knew why she was at the hospital. J.B. responded that her daddy put his finger in her booty and pointed to her front genital area. Smith then asked whether her father had told her anything, to which J.B. responded that her father had said that he would "whip her ass" if she told anyone what had happened.

On October 26, 2005, Seely was charged with rape under Arkansas Code Annotated § 5-14-103 (Supp. 2005), for having engaged in sexual intercourse or deviate sexual activity with a minor who was less than fourteen years old. Before trial, on January 10, 2006, Seely moved for an *in camera* hearing to determine the competency of J.B., who was three years old at that time, to testify at trial. A hearing subsequently was held at which J.B., who was then four years old, was found incompetent to testify and therefore unavailable for trial under our Child Hearsay Rule. *See* Ark. R. Evid. 804(b)(7) (2006).

At the same hearing, the court examined (1) whether, under Rule 804(b)(7), the requirements had been met to establish an exception to the hearsay rule which would allow Barnes and Smith to testify about the statements J.B. made to them and (2) whether Seely's Sixth Amendment rights would be violated by allowing such testimony. At the hearing, Barnes testified regarding the events leading to her taking J.B. to the emergency room, as already recounted above, and Smith testified as to the statements made to her by J.B.

Smith also testified at the hearing about the purpose of her interview with J.B. She stated that the main objective of her

interview with J.B. was to determine whether a physical exam should be conducted and, if so, what type of physical exam. The amount of time that had expired since the suspected abuse was important, she said, because examinations are not generally conducted at the emergency room if more than seventy-two hours have expired. Smith further testified that she is a mandated child-abuse reporter and that she has testified at more than fifty trials during the past twenty years. The circuit court found that both Barnes's and Smith's statements were admissible at trial.

A jury trial was held on July 27, 2006. At trial, both Barnes and Smith testified as to J.B.'s statements to them regarding the rape. Also testifying was Dr. Maria Esquivel, a pediatrician at Arkansas Children's Hospital who examined J.B. on September 23, 2005. Dr. Esquivel testified that J.B. had injuries to her vagina that were consistent with penetration by a finger or other foreign object within two or three days before the examination. Dr. Esquivel testified, in addition, that the injuries could have been caused in some other way.

Seely testified in his own defense, as the defense's sole witness during the guilt phase of the trial. Seely testified that he had never sexually abused his daughter. He also testified that, at the time of the incident, Barnes and he were more like .roommates than a couple and that a few days before Barnes took J.B. to the emergency room, he had lost his job, which caused Barnes to be angry with him.

The jury found Seely guilty of rape and sentenced him to imprisonment for a term of twenty years.[1] Seely appealed to the Arkansas Court of Appeals. The court of appeals issued an opinion holding that the circuit court erroneously allowed Smith to testify about J.B.'s hearsay statements. *Seely v. State*, 100 Ark. App. 33, 263 S.W.3d 559 (2007). As a result, the court of appeals reversed Seely's conviction and remanded the case to the circuit court for a new trial. This court then granted the State's petition for review. Because this case is before us pursuant to our grant of a petition for review, we consider the matter as if it had originally been filed in this court. *Van Wagner v. Wal-Mart Stores, Inc.*, 368 Ark. 606, 608, 249 S.W.3d 123, 124 (2007).

---

[1] Because of his three prior felony convictions for attempt to manufacture a controlled substance, residential burglary, and possession of drug paraphernalia, Seely was sentenced as a habitual offender.

Seely contends as his sole issue on appeal that J.B.'s statements to Barnes and Smith were testimonial hearsay and that by allowing Barnes and Smith to testify about these statements, the circuit court violated his Sixth Amendment right to confront and cross-examine all witnesses against him. In support of this argument, Seely notes that on the night in question, J.B. was playing before and after making the statements implicating him to Barnes and that, therefore, no bona fide emergency existed.

Seely also claims that no emergency existed in connection with J.B.'s statements to Smith. Seely points out that Smith is a mandated child-abuse reporter, who shares information with the Child Abuse Hotline, police officers, and the prosecuting attorney. Seely further notes that Smith regularly testifies in court in child-molestation cases. Smith's interview with J.B., he argues, was not for medical purposes. If it had been, Seely states, Smith would not have been concerned about the identity of the perpetrator but only with the act that had caused the injury. Nor, Seely notes, does the record indicate that J.B. was upset or under stress during the interview with Smith.

We initially observe that Seely's appeal raises a question of constitutional interpretation, which is subject to this court's *de novo* review. *Navarro v. State*, 371 Ark. 179, 193, 264 S.W.3d 530, 540 (2007). In order for hearsay statements to be admissible against a defendant at a criminal trial, two separate requirements must be met. *See Crawford v. Washington*, 541 U.S. 36, 60 (2004) (noting statements that fall under firmly rooted hearsay exceptions are not exempt from scrutiny under the Confrontation Clause). First, an exception to the general rule prohibiting hearsay must be demonstrated. Second, the admission of the hearsay cannot violate the defendant's Sixth Amendment right "to be confronted with the witnesses against him." U.S. Const. amend. 6.[2]

In 1992, this court adopted Rule 804(b)(7) of the Arkansas Rules of Evidence, thereby creating the child-hearsay exception to the rule excluding hearsay. *In re Addition to Arkansas Rules of Evidence*, 309 Ark. 628, 630-31 (1992). In the case at hand, Seely has not challenged the circuit court's finding that the requirements

---

[2] In 1965, the United States Supreme Court held that the Confrontation Clause of the Sixth Amendment is "a fundamental right ... made obligatory on the States by the Fourteenth Amendment." *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

of the unavailable–child exception to the rule excluding hearsay were met. Rule 804(b)(7) provides as follows:

(b) *Hearsay Exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(7) *Child Hearsay in Criminal Cases.* A statement made by a child under the age of ten (10) years concerning any type of sexual offense against that child, where the Confrontation Clause of the Sixth Amendment of the United States is applicable, provided:

(A) The trial court conducts a hearing outside the presence of the jury, and, with the evidentiary presumption that the statement is unreliable and inadmissible, finds that the statement offered possesses sufficient guarantees of trustworthiness that the truthfulness of the child's statement is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility. The trial court may employ any factor it deems appropriate including, but not limited to those listed below, in deciding whether the statement is sufficiently trustworthy.

1. The spontaneity of the statement.

2. The lack of time to fabricate.

3. The consistency and repetition of the statement and whether the child has recanted the statement.

4. The mental state of the child.

5. The competency of the child to testify.

6. The child's use of terminology unexpected of a child of similar age.

7. The lack of a motive by the child to fabricate the statement.

8. The lack of bias by the child.

9. Whether it is an embarrassing event the child would not normally relate.

10. The credibility of the person testifying to the statement.

11. Suggestiveness created by leading questions.

· 12. Whether an adult with custody or control of the child may bear a grudge against the accused offender, and may attempt to coach the child into making false charges.

(B) The proponent of the statement gives the adverse party reasonable notice of his intention to offer the statement and the particulars of the statement.

(C) This section shall not be construed to limit the admission of an offered statement under any other hearsay exception or applicable rule of evidence.

Until 2004, Rule 804(b)(7)'s requirement that a child's hearsay statement "possess[] sufficient guarantees of trustworthiness," was in line with the United States Supreme Court's Sixth Amendment jurisprudence. The controlling law at that time was defined by *Ohio v. Roberts*, which said:

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate indicia of reliability. Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

448 U.S. 56, 66 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004) (quotations and citations omitted).

In applying the *Roberts* standard to hearsay regarding the statements made to a doctor by a child-abuse victim who was three years old at the time of trial, the Supreme Court noted that "the particularized guarantees of trustworthiness required for admission under the Confrontation Clause must . . . be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief. . . . [E]vidence . . . must . . . be so trustworthy that adversarial testing would add little to its reliability." *Idaho v. Wright*, 497 U.S. 805, 820-21 (1990) (quotation omitted).

In the *Roberts/Wright* era, the Supreme Court also emphasized the importance of the State's interest in protecting victims of child abuse, holding that where a court made a finding that a child witness would be traumatized by testifying in the presence of the defendant, a procedure allowing a child to testify via closed-circuit television did not violate the Confrontation Clause.[3] *Maryland v. Craig*, 497 U.S. 836, 841-42, 857 (1990). In so holding, the Court noted that, "our precedents establish that the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial, a preference that must occasionally give way to considerations of public policy and the necessities of the case." *Id.* at 849 (citations and quotations omitted). The Court further noted that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Id.* at 853.

In 2004, the *Roberts/Wright* era came to an end with the Supreme Court's decision in *Crawford v. Washington*, in which the Court found that "amorphous notions of 'reliability' " are not the touchstone of Confrontation Clause analysis. *Crawford*, 541 U.S. at 61. Rather, the Court found that the Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.*

Under *Crawford*, the analysis of whether the hearsay statement of a witness who does not appear at trial is admissible turns on whether the statement is testimonial. *Id.* at 53-54, 68. The Court said:

> The text of the Confrontation Clause reflects this focus [on testimonial statements]. It applies to "witnesses" against the accused — in other words, those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the

---

[3] The particular procedures at issue in *Craig* called for defense counsel to be (1) present in the room with the child during the testimony, (2) able to object and conduct cross-examination, and (3) in communication with the defendant. *Craig*, 497 U.S. at 842 n.1.

history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

*Id.* at 51. If a statement is testimonial, then it cannot be admitted unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. *Id.* at 53-54. In *Crawford*, the Court said that nontestimonial statements, if not entirely outside of the scope of the Confrontation Clause, are at least not "its primary object." *Id.* at 53. In a later case, the Court held that, while nontestimonial hearsay is "subject to traditional limitations upon hearsay evidence," it "is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006).

In *Crawford*, the Court "le[ft] for another day any effort to spell out a comprehensive definition of 'testimonial.' " 541 U.S. at 68. "Whatever else the term covers," the Court noted, "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* Since *Crawford*, the Court has provided only limited guidance as to the definition of testimonial, most of which is specific to the context of statements made to police officers. *See Davis*, 547 U.S. 813.

In holding that a domestic-violence victim's statements over the telephone to a 911 operator were nontestimonial, the Court in *Davis* "conclude[d] . . . that the circumstances of [the victim's] interrogation objectively indicate its *primary purpose* was to enable police assistance to meet an ongoing emergency. *Id.* at 828 (emphasis added). Four factors influenced the Court's decision. First, the victim was "speaking about events *as they were actually happening*, rather than describing past events." *Id.* at 827 (quotation omitted). Second, the victim "was facing an ongoing emergency." *Id.* Third, "the nature of what was asked and answered . . . viewed objectively, was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn . . . what had happened in the past." *Id.* Fourth, the interview took place in an informal setting, with the victim making "frantic answers . . . over the phone, in an environment that was not tranquil, or even . . . safe." *Id.* "No 'witness,' " the Court noted, "goes into court to proclaim an emergency and seek help." *Id.*

The Court contrasted the situation in *Davis* with the situation in *Hammon v. Indiana*, No. 05-5705, a case that had been consolidated with *Davis* for the purpose of appeal, and found that

the statement of another victim of domestic violence to police officers who arrived after an attack was complete when "there was no immediate threat to her person." The statement was testimonial because "the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." *Id.* at 830.

The *Davis* Court summarized as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822.

The *Davis* Court also indicated that, while important State interests such as the protection of child-abuse victims may justify denying a defendant the right to confront his or her accuser face-to-face, *Craig*, 497 U.S. at 853, they cannot justify denying a defendant the right to confront his or her accuser through cross-examination, *see Davis*, 547 U.S. at 833 (acknowledging that domestic-abuse victims are "notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial," but explaining that "[w]e may not . . . vitiate constitutional guarantees when they have the effect of allowing the guilty to go free").

In applying *Crawford* and *Davis* to the instant case, this court is faced with the task of determining what types of statements are testimonial. In its discussion of the historical abuses that led to the Framers' adoption of the Confrontation Clause, *Crawford* indicates that government involvement in procuring the hearsay statement is a factor to be considered. 511 U.S. at 43-50, 53. *Crawford* also indicates that the *formality* of the situation in which the statement was made may be an important consideration. *Id.* at 51.

In the context of police interrogations and statements made to other government officials, the four factors outlined in *Davis* give clear guidance as to what should be considered in determining whether a statement is nontestimonial. These factors, however, have limited applicability to statements that are not made to a

government official. For example, the Court has made it clear that a casual statement made to an acquaintance can be nontestimonial, despite the fact no emergency exists. *See Davis*, 547 U.S. at 825 (giving examples of "clearly nontestimonial" statements made to nongovernment officials in nonemergency situations). Therefore, the Court appears to draw a clear distinction between statements made to police officers or other governmental officials, which are generally testimonial, and statements made to people who are not governmental officials.

Davis does, however, announce a "primary-purpose test" that can be modified for use outside the context of police interrogations: statements are testimonial when "the circumstances objectively indicate that . . . the primary purpose" of the statement "is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822. Moreover, there are indications that the court intends the focus to be on the primary purpose of the person making the statement, rather than the primary purpose of the listener or questioner. *See id.* at 825 (noting that "statements made unwittingly to a Government informant" are "clearly nontestimonial"); *Id.* at n.1 ("[I]t is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate."). In examples of potential testimonial hearsay noted by the Court in *Crawford*, two focus on whether the circumstances surrounding a statement "would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 541 U.S. 51-52. Nevertheless, *Davis* makes it clear that, particularly when a governmental agent or a stand-in for a governmental agent is involved in questioning, the primary purpose of the questioner may be relevant in determining whether a statement was given "under circumstances objectively indicating that . . . the primary purpose" of the statement was "to establish or prove past events potentially relevant to later criminal prosecution." 547 U.S. at 822.

We conclude that in light of *Crawford* and *Davis*, both the primary purpose of the person making the statement and the primary purpose of the person asking the questions may be relevant to a confrontation-clause analysis.

Several lower courts that have examined the issue in the wake of *Crawford* and *Davis* have found a distinction between statements made to government officials and statements made to nonofficials. *See, e.g., State v. Contreras*, 979 So. 2d 896, 903-04

(Fla. 2008). Such courts have frequently held that statements to government officials are judged by the "primary-purpose test" under which a statement is testimonial if it is made for the primary purpose of creating evidence, while statements to nonofficials are judged under the "objective-witness test" and are testimonial only if an objective witness would reasonably believe that the statement would be available for use at a later trial. *Contreras*, 979 So. 2d at 903-04; *State v. Siler*, 116 Ohio St. 3d 39, 44-45, 876 N.E.2d 534, 539-40 (2007) (distinguishing between the "primary-purpose test" applied to statements made to law-enforcement officers and the "objective-witness test" applied to statements "made to medical professionals at a medical facility for the primary purpose of receiving proper medical treatment").

At least one court, however, has recognized that applying the objective-witness test to a young child is "unworkable . . . [,] strained, awkward, and easily capable of abuse." *State v. Spencer*, 339 Mont. 227, 232-33, 169 P.3d 384, 389-90 (2007); *see also State v. Henderson*, 384 Kan. 267, 160 P.3d 776 (2007) ("A young victim's awareness, or lack thereof, that her statement would be used to prosecute, is not dispositive of whether her statement is testimonial. Rather, it is but one factor to consider in light of *Davis'* guidance after *Crawford*. Until we receive further guidance from the United States Supreme Court, our test is an objective, totality of the circumstances test to determine the primary purpose of the interview, as discussed and seemingly applied in *Davis*.").

■ We conclude that a more appropriate test should recognize the distinction between statements to government officials and statements to nonofficials. Moreover, the test should remain focused on the circumstances surrounding the statement and whether those circumstances objectively indicate that the primary purpose of the statement is to prove events relevant to criminal prosecution. Where a statement is made to a government official, it is presumptively testimonial, but the statement can be shown to be nontestimonial where the primary purpose of the statement is to obtain assistance in an emergency. *See Davis*, 547 U.S. 813. Where a statement is made to a nonofficial, it is presumptively nontestimonial, but can be shown to be testimonial if the primary purpose of the statement is to create evidence for use in court. *See, e.g.*, *State v. Spencer*, 339 Mont. 227, 230-31, 169 P.3d 384, 388 (2007) ("In general, a declarant's statements are presumed testimonial if they are knowingly made to a police officer or government agent. A statement is presumed non-testimonial,

however, if the declarant had objective reason to believe that the statement served only to avert or mitigate an imminent or immediate danger and the agent receiving the statement lacked intent to create evidence. A statement made to a nongovernmental agent is non-testimonial *unless* the declarant had clear reason to believe that the statement would be used in court as substantive evidence against the defendant.") (citations and quotations omitted).

■ Applying this objective primary-purpose standard to the instant case, it is clear that the statements made by J.B. to her mother, Suzette Barnes, were nontestimonial. Barnes was acting as J.B.'s caretaker and not as a government agent. She questioned J.B. about the cause of her injuries with the primary purposes of ascertaining the nature of her injuries, providing comfort, and determining whether medical intervention was necessary. Moreover, the statement took place in an informal setting where Barnes was preparing for J.B. to go to bed in her own home.

Other courts that have addressed this issue have concluded that statements made to parents and caretakers are not generally testimonial in nature where a parent is not specifically questioning a child for the purpose of obtaining evidence for use in court. *See, e.g., Bishop v. State*, 982 So. 2d 371, 375 (2008) ("[The child's mother] is not a police officer, and was not working in conjunction with law enforcement for the purposes of prosecuting Bishop when C.C. disclosed to her that Bishop had been sexually abusing her. Moreover, the record reflects that statements made by C.C. to her mother were completely spontaneous."); *State v. Ladner*, 373 S.C. 103, 114, 644 S.E.2d 684, 689-90 (2007) (holding that a child's statement to her caretaker about the cause of the blood found in her diaper was not testimonial where "[the caretaker's] questions, as well as the victim's responses, were not designed to implicate the criminal assailant, but to ascertain the nature of the child's injury"). As other courts have noted, "simply because 'parents turn over information about crimes to law enforcement authorities does not transform their interactions with their children into police investigations.' " *Id.* at 115, 644 S.E.2d at 690 (quoting *Purvis v. State*, 829 N.E.2d 572 (Ind. Ct. App. 2005)). Moreover, J.B. clearly approached Barnes seeking relief from the pain that she was experiencing, not to report her father's actions. We hold that J.B.'s statements to her mother were nontestimonial.

We turn next to the statements made by J.B. to the social worker, Trish Smith. As a preliminary matter, we observe that

Smith had a duty to report child abuse to the Child Abuse Hotline. We conclude, though, that this duty to report, by itself, did not render all statements made by J.B. to her testimonial. *See U.S. v. Peneaux*, 432 F.3d 882, 894 (8th Cir. 2005); *Spencer*, 339 Mont. at 231, 169 P.3d at 388-89 ("In addition to foster parents and social workers, the statute [Mont. Code Ann. § 41-3-201] also requires reporting by physicians, residents, interns, and other hospital staff; nurses, osteopaths, chiropractors, podiatrists, medical examiners, coroners, dentists, optometrists, and other health or mental health professionals; religious healers; school teachers and school employees; day-care facility staff; and, clergy members, among others. There is no indication, however, that the Legislature intended to deputize this litany of professionals and individuals into law enforcement, and we refuse to attach that significance to the duty to report.") (citations omitted).

The question of whether Smith was acting as a government agent must turn on the primary purpose of her interview with J.B. If the primary purpose of the interview was to gather evidence for potential use in a subsequent prosecution, Smith was acting as a government agent. *See State v. Justus*, 305 S.W.3d 872, 880 (Mo. 2006) ("Although [the social worker] is not a government worker, she was acting as a government agent when she interviewed S.J. . . . While there is no doubt that one purpose of the interrogations was to enable assistance to the child, the circumstances indicate that their primary purpose was to establish or prove past events potentially relevant to later criminal prosecution.")

Given Smith's prior testimony in child-abuse cases and her provision of information to police officers and prosecutors, it seems clear that she would have anticipated during her interview with J.B. that the information she gathered might be used in a subsequent prosecution. It does not necessarily follow, though, that the *primary* purpose of Smith's interview with J.B. was to collect evidence rather than to provide medical treatment. J.B. was experiencing pain and was about to be given a medical examination. Smith testified that her interview with J.B. was primarily for the purpose of defining the scope of that medical examination.

Furthermore, the proper treatment of J.B. included ensuring her continued safety. The identity of anyone who may have harmed J.B. was relevant to ensuring her safety after she left the hospital. *See Peneaux*, 432 F.3d at 894 ("'T.P.'s statements identifying Peneaux as the abuser are of the type reasonably relied upon by a physician for treatment or diagnosis. Due to the nature of

child sexual abuse, a doctor must be able to identify and treat not only physical injury, but also the emotional and psychological problems that typically accompany sexual abuse by a family member. Moreover, such a statement may be relevant to prevent future occurrences of abuse and to the medical safety of the child. Dr. Strong explained that identification of the abuser is a matter of great concern because if the person who brought the child to the clinic is the abuser, the child should not leave with that individual.") (citations omitted).

Nor did a police officer or other law-enforcement official instigate, observe, or participate in the J.B.–Smith interview. *See State v. Hooper*, 145 Idaho 139, 141, 176 P.3d 911, 913 (2007) (finding a child's statement to a doctor to be testimonial where (1) the police arranged a forensic exam and observed the interview via a closed circuit system and (2) a tape of the interview was immediately placed with other evidence in a police storage); *Contreras*, 979 So. 2d at 905 ("[T]he facts of the instant case show that the coordinator of the Child Protection Team, while working with the county sheriff, took a statement from the victim regarding the allegations of sexual molestation. . . . While the law enforcement officer was not in the room during the interview, he was connected electronically to the CPT coordinator in order to suggest questions. In light of the police presence and the electronic connection, we conclude that the CPT coordinator was serving as a police proxy in this interview. This is reinforced by the statutory connection of the CPT to such investigations and prosecutions. . . . Moreover, the primary, if not the sole, purpose of the CPT interview was to investigate whether the crime of child sexual abuse had occurred, and to establish facts potentially relevant to a later criminal prosecution.") (citations omitted).

J.B. was a very young child who was in pain and who wanted to see a doctor. There is no indication that J.B. was told that the interview was taking place because police officers needed to know what had happened to her. *Compare State v. Bentley*, 739 N.W.2d 296, 299 (Iowa 2007), *cert. denied*, 128 S. Ct. 1655 (2008) (holding that a child's statement to a medical professional was testimonial where the child was told that the police were listening to the interview and was implored to continue talking because it was important for the police to know what had happened), *with State v. Krasky*, 736 N.W.2d 636, 641–42 (Minn. 2007), *cert. denied*, 128 S. Ct. 1223 (2008) (holding that a child's statement to a medical

professional was nontestimonial where the child was told that the interview was for the purpose of assessing the child's health).

We hold that J.B.'s statements to Trish Smith were nontestimonial based on the fact that, using an objective standard, the primary purpose of the interview was medical treatment. Accordingly, we affirm the judgment of conviction on this point and reverse the court of appeals.

Circuit court affirmed. Court of appeals affirmed in part and reversed in part.