FLAHERTY, J., and INDEGLIA, J„
dissenting in part and concurring in the result.
Hindsight is always twenty-twenty — especially when afforded the benefit of almost seven years of clarifying United States Supreme Court jurisprudence. After a careful review of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and its progeny, we respectfully have concluded that we must write separately.
We are unable to agree with the majority’s conclusion that, by failing to raise a specific objection under the Confrontation Clause to certain testimony presented at trial, Moten has waived that argument on appeal.[9] In our opinion, Moten’s objection under the Confrontation Clause was novel at the time Dr. Harper testified to the out-of-court statements made by the ophthalmologist regarding a retinal examination that the ophthalmologist had performed on the injured .infant. Therefore, this Court should have reached the merits of whether these out-of-court statements were testimonial in nature. Although we ultimately conclude that those statements were non-testimonial and that, therefore, their admission did not violate Moten’s right of confrontation, we cannot agree with the majority that Moten’s failure to articulate the Confrontation Clause as the basis for his objection to that portion of Dr. Harper’s testimony precludes him from raising that argument before this Court on appeal.
Preservation of Error
As the majority points out, this Court recognizes a narrow exception to our well- *1244 settled “raise or waive” rule. For that exception to apply, “the alleged error must be more than harmless, and the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial.” State v. Breen, 767 A.2d 50, 57 (R.I.2001).
The majority concedes that, “[cjertainly, at the time of defendant’s trial, the [United States] Supreme Court had not established the precise contours of what is and what is not ‘testimonial evidence.’ ” In fact, the Crawford Court explicitly acknowledged that it declined to articulate a comprehensive definition of the term “testimonial,” explaining: “[w]e leave for another day any effort to spell out a comprehensive definition of ‘testimonial.’ ” Crawford, 541 U.S. at 68, 124 S.Ct. 1354.[10] It was not until approximately three-and-one-half years after Moten’s trial, which took place in 2006, that the United States Supreme Court moved beyond the realm of interrogation and considered whether forensic analyses — statements much more akin to the ophthalmologist’s out-of-court statements made to Dr. Harper — were testimonial in nature and, thus, subject to exclusion under the Confrontation Clause. See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).
Indeed, in Melendez-Diaz, 557 U.S. at 307, 129 S.Ct. 2527 the Supreme Court was asked for the first time to identify whether “affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine * * * [we]re ‘testimonial,’ [thereby] rendering the affiants ‘witnesses’ subject to the defendant’s right of confrontation under the Sixth Amendment.” The Court held that the admission of those affidavits violated the defendant’s right of confrontation because the affiants were not available for cross-examination. Id. at 311, 129 S.Ct. 2527. In so holding, the Court reasoned that the affidavits were “made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial * * Id.
Although the Court stated that its holding “involvefd] little more than the application of [the] holding in Crawford,” in reality, Melendez-Diaz was pivotal in Sixth Amendment jurisprudence. Melendez-Diaz, 557 U.S. at 329, 129 S.Ct. 2527. In its wake, trial judges could do little more than “guess what future rules th[e] Court w[ould] distill from the sparse constitutional text” of the Sixth Amendment. Melendez-Diaz, 557 U.S. at 331, 129 S.Ct. 2527 (Kennedy, J., dissenting). Indeed, one year after Melendez-Diaz was decided, the Supreme Judicial Court of Massachusetts observed that the scope of the Confrontation Clause remained “unsettled” and that Crawford’s reach “was, and remained], vigorously debated.” Commonwealth v. Vasquez, 456 Mass. 350, 923 N.E.2d 524, 532(2010). We agree.
Two years after the decision in Melendez-Diaz, the United States Supreme Court decided Bullcoming v. New Mexico, *1245 — U.S. -, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). There, the Court was asked to address whether the Sixth Amendment allowed “the in-court testimony of an analyst who did not sign [a testimonial] certification [of a forensic laboratory report concerning the blood alcohol concentration of the defendant] or personally perform or observe the performance of the • test reported in the certification.” Bullcoming, 131 S.Ct. at 2713. In holding that the defendant had a right to confront the analyst who actually certified that report, the Court cited Melendez-Diaz, 557 U.S. at 319-26, 129 S.Ct. 2527 for support that “[a]n analyst’s certification prepared in connection with a criminal investigation or prosecution * * * is ‘testimonial,’ and therefore within the compass of the Confrontation Clause.” Bullcoming, 131 S.Ct. at 2713-14. The Court described its decision as “in line with controlling precedent,” id. at 2713; however, the dissent maintained, correctly in our view, that “[t]he persistent ambiguities in the Court’s approach are symptomatic of a rule not amenable to sensible applications.” Id. at 2726 (Kennedy, J., dissenting).
Similarly, when Moten was tried in 2006, this Court had provided little guidance on the application of Crawford. In State v. Feliciano, 901 A.2d 631, 642 (R.I.2006)— decided a mere five months prior to Mo-ten’s trial — this Court stated: “[W]e leave for another day the chore of fleshing out the extent to which the [United States] Supreme Court’s elucidation of the Confrontation Clause otherwise affects our case law on the subject, if at all.” See also State v. Harris, 871 A.2d 341, 345 n. 12 (R.I.2005) (“[T]he meaning of th[e] term [testimonial] will one day have to be more precisely defined by the courts.”).
And so, we are now left to consider whether, at the time of Moten’s trial— years before Melendez-Diaz and Bullcom-ing applied Crawford’s reach beyond statements made to police officers — defense counsel could have reasonably known that the admission of out-of-court statements made by one doctor to another regarding the results of a retinal eye examination potentially might violate Moten’s right of confrontation. We conclude that, even if those cases did not clearly announce novel rules of law, they certainly employed novel applications to an unsettled rule of law. In reading the holdings of Melendez-Diaz and Bullcoming as mere applications of Crawford, the majority, in our opinion, does not sufficiently appreciate that both of those cases substantially expanded the scope of the Confrontation Clause.
Today, it is easy to conclude that competent defense counsel would raise an objection under the Confrontation Clause to the disputed portion of Dr. Harper’s testimony, but we cannot say that Moten’s counsel should have reasonably known that that objection would have been prudent at the time of his trial. See Breen, 767 A.2d at 57. Although it cannot reasonably be disputed that the exception to our “raise or waive” rule is indeed a narrow one, we maintain that the majority effectively reads this exception out of our jurisprudence. The line between a novel rule of law and the application of a rule of law in a new context can sometimes be blurry, if not indistinguishable. We acknowledge that this is a close call, but we cannot fault defense counsel for his failure to forecast Crawford’s application to the facts at issue. Accordingly, we respectfully suggest that the majority should have addressed the Confrontation Clause issue as it relates to the disputed portion of Dr. Harper’s testimony to determine whether the trial justice erred in admitting this testimony.
Application of the “Primary Purpose” Test
We now turn to the merits of Moten’s Confrontation Clause challenge. Our in *1246 quiry focuses on whether the out-of-court statements made by the ophthalmologist to Dr. Harper concerning the results of a retinal eye test performed on the baby were testimonial in nature. Contending that those statements were testimonial, Moten ascribes error to the admission of that testimony. The state counters that those statements did not violate Moten’s right of confrontation, because Dr. Harper essentially testified to her own medical opinions and she was subject to cross-examination. As we noted above, guidance from the United States Supreme Court on this issue has been less than clear. However, we set forth the law as best we can derive it from applicable precedent.
In determining whether the ophthalmologist’s statements were testimonial, we employ the primary purpose test. See Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (Statements “are testimonial when the circumstances objectively indicate that there is no * * * ongoing emergency, and that the[ir] primary purpose * * * is to establish or prove past events potentially relevant to later criminal prosecution.”). In so doing, we look to “the circumstances in which the encounter occurs and the statements and actions of the parties.” Michigan v. Bryant, — U.S. -, 131 S.Ct. 1143, 1156, 179 L.Ed.2d 93 (2011). If this inquiry reveals that the ophthalmologist’s statements were made for the primary “purpose of proving the guilt of a particular criminal defendant at trial” or “to provide a solemn declaration for use at trial,” those statements would implicate the Confrontation Clause. Williams v. Illinois, - U.S. -, 132 S.Ct. 2221, 2243, 183 L.Ed.2d 89 (2012) (plurality op.).
Doctor Harper was statutorily obligated, pursuant to G.L.1956 § 40-11-6,[11] to report suspected child abuse or neglect, as defined in G.L.1956 § 11-9-5.3,[12] to the Department of Children, Youth and Families (DCYF) and law enforcement. Although this Court has not yet had the opportunity to address the interplay between a statutory duty to report and the Confrontation Clause, we need not write on a blank slate. We agree with other jurisdictions that have held that a statutory duty to report does not necessarily render a statement testimonial under the Confrontation Clause. See, e.g., Seely v. *1247 State, 373 Ark. 141, 282 S.W.3d 778, 788 (2008) (holding that a social worker’s duty to report child abuse did not, by itself, render the child victim’s statements testimonial); State v. Spencer, 339 Mont. 227, 169 P.3d 384, 389 (2007) (holding that a mandatory reporting statute was not “intended to deputize th[e] litany of professionals and individuals [listed therein] into law enforcement”). The focus should remain on the circumstances surrounding the statement and whether those circumstances objectively indicate that the primary purpose of the statement is to prove events relevant to criminal prosecution. See Melendez-Diaz, 557 U.S. at 310, 129 S.Ct. 2527 (citing Crawford, 541 U.S. at 51-52, 124 S.Ct. 1354). In so doing, we must turn to the primary purpose of Dr. Harper’s consultation with the ophthalmologist. See Bryant, 131 S.Ct. at 1157; see, e.g., State v. Justus, 205 S.W.3d 872, 880 (Mo.2006) (holding that the primary purpose of an interview was to preserve testimony for a later criminal prosecution, thereby rendering the declarant’s statements testimonial; interviewer knew that her interview was “an official interview done for law enforcement” and interviewee was aware that her statements could be used to prosecute the defendant); State v. Blue, 717 N.W.2d 558, 564-65 (N.D.2006) (holding that the declarant’s statements during an interview were testimonial because there was no “ongoing emergency” and the primary purpose was undoubtedly to prepare for trial).
In light of Dr. Harper’s statutory obligation to contact DCYF — and because evidence of retinal hemorrhages is delineated by the statute as one way to demonstrate serious bodily injury, thus establishing first degree child abuse — it seems clear that Dr. Harper would have anticipated that the information gathered from the ophthalmologist might be used in a subsequent prosecution. See § 11 — 9—5.3(c)(4) (defining “retinal hemorrhages” as one form of serious bodily injury). It does not necessarily follow, however, that the primary purpose of the ophthalmologist’s statements was to provide evidence of criminal conduct rather than to provide medical treatment. See Bryant, 131 S.Ct. at 1157. Moreover, there was no evidence that Dr. Harper contacted the ophthalmologist at the specific request of the police or DCYF.
In our view, the primary purpose of the ophthalmologist’s examination was to determine the extent of the injuries to the baby for the purpose of rendering medical treatment. Doctor Harper testified that she was concerned with the baby’s retinal bleeding, which could otherwise lead to blindness if left untreated.[13] Indeed, she stated that the attending physician performed another eye examination on the baby the very next morning — as well as on several other occasions in the following weeks and months — because of the concern that retinal hemorrhages could damage the baby’s eyesight. Thus, even if it was known or suspected that the ophthalmologist’s reports would likely be used in a future criminal trial, the primary function of the report was not to accuse “a targeted individual of engaging in criminal con *1248 duct,” Williams, 132 S.Ct. at 2242, or to “establish or prove past events potentially relevant to later criminal prosecution.” Davis, 547 U.S. at 822, 126 S.Ct. 2266; see also Bryant, 131 S.Ct. at 1154; Melendez-Diaz, 557 U.S. at 310, 129 S.Ct. 2527. Rather, the primary purpose of the ophthalmologist’s report was to resolve an ongoing medical emergency — to wit, damage to the baby’s eye sight and the potential threat of blindness. Because the primary purpose of the ophthalmologist’s statements was to resolve that emergency with proper medical treatment, thereby rendering the statements nontestimonial, we would conclude that their admission did not violate the Confrontation Clause.
Although we respectfully disagree with the majority’s conclusion that Moten’s Confrontation Clause challenge was not novel, and believe that the majority should have reached the merits of this issue, we ultimately conclude — after our own review of the merits — that the majority reached the proper result in affirming the judgment of conviction, because the evidence offered by Dr. Harper was nontestimonial.

. Moten did object to the admission of this testimony on what could have been understood to be hearsay grounds, which the trial justice overruled. It is noteworthy that in a decision issued just before the trial in this case commenced, this Court left for another day the decision as to "whether a defendant’s unsuccessful objection to a statement on hearsay grounds alone would have preserved the Crawford issue for review on appeal.” State v. Harris, 871 A.2d 341, 345 n. 11 (R.I.2005).

. There is no question that the Crawford Court identified a "core class of 'testimonial statements,'" including extrajudicial statements such as affidavits, depositions, prior testimony, and confession. Crawford v. Washington, 541 U.S. 36, 51-52, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). However, the closest the Court came to actually defining — rather than merely describing-the term "testimonial statement” was in its catchall example of “statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.” Id. at 52, 124 S.Ct. 1354.

. General Laws 1956 § 40-11-6 provides, in pertinent part:
"(a) When any physician or duly certified registered nurse practitioner has cause to suspect that a child brought to him or her or coming to him or her for examination, care, or treatment, is an abused or neglected child as defined in this chapter, * * * he or she shall report the incident or cause a report thereof to be made to [DCYF] as provided in subsection (b).
"(b) An immediate oral report shall be made by telephone or otherwise, to both the department and law enforcement agency, and shall be followed by a report, in writing, to the department and law enforcement agency explaining the extent and nature of the abuse or neglect the child is alleged to have suffered.”

. In this case, Moten was found guilty of first degree child abuse under G.L.1956 § 11-9-5.3(b)(1), which provides, in pertinent part:
“(b) Whenever a person having care of a child, as defined by § 40-11-2(2) [as ‘a person under the age of eighteen (18)’], whether assumed voluntarily or because of a legal obligation, including any instance where a child has been placed by his or her parents, caretaker, or licensed or governmental child placement agency for care or treatment, knowingly or intentionally:
"(1) Inflicts upon a child serious bodily injury, shall be guilty of first degree child abuse.”
Section 11-9-5.3(c) defines "serious bodily injury,” to include physical injury that:
"(4) Evidences subdural hematoma, in-tercranial hemorrhage and/or retinal hemorrhages as signs of ‘shaken baby syndrome’ and/or 'abusive head trauma.’ ”

. Specifically, Dr. Harper testified that
“once you have hemorrhages in the eye, it can keep you from seeing well. And if you can’t see well, and when you’re young and trying to develop your vision, it can cause permanent difficulties with something called amblyopia where you can’t focus properly. You look cross-eyed. You may even go blind. So, there are grave concerns once you see these injuries to the back of the eye. You have to follow them closely and to make sure that she sees clearly and to make sure that the baby doesn’t need surgery on the eye. It’s a concerning point.’’