THE STATE OF OHIO, APPELLEE, *v*. ARNOLD, APPELLANT.

[Cite as *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742.]

*Statements made to interviewers at child-advocacy centers that serve primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause — Statements made to interviewers at child-advocacy centers that are made for medical diagnosis and treatment are nontestimonial and are admissible without offending the Confrontation Clause.*

(No. 2008-1693 — Submitted September 1, 2009 — Decided June 17, 2010.)

APPEAL from the Court of Appeals for Franklin County,

No. 07AP-789, 2008-Ohio-3471.

_____

SYLLABUS OF THE COURT

1. Statements made to interviewers at child-advocacy centers that serve primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause when the declarant is unavailable for cross-examination.

2. Statements made to interviewers at child-advocacy centers that are made for medical diagnosis and treatment are nontestimonial and are admissible without offending the Confrontation Clause.

_____

O'CONNOR, J.

{¶ 1} Appellant, Michael Arnold, appeals his conviction for raping his four-year-old daughter, M.A. Arnold argues that statements that M.A. made to social worker Kerri Marshall at the Center for Child and Family Advocacy at

Nationwide Children's Hospital ("CCFA") were admitted contrary to his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. The court of appeals affirmed Arnold's conviction, holding that Marshall did not act as an agent of the police when she questioned M.A. and that M.A.'s statements during the interview were nontestimonial.

{¶ 2} In interviewing M.A. at the CCFA, Marshall occupied dual capacities: she was both a forensic interviewer collecting information for use by the police and a medical interviewer eliciting information necessary for diagnosis and treatment. We hold that statements made to interviewers at child-advocacy centers that are made for medical diagnosis and treatment are nontestimonial and are admissible without offending the Confrontation Clause. Thus, we affirm the judgment of the court of appeals to the extent that M.A.'s statements to Marshall for the purpose of medical treatment and diagnosis were properly admitted. We further hold that statements made to interviewers at child-advocacy centers that serve primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause. We agree with Arnold that the trial court erred in admitting the forensic statements made by M.A. to Marshall and reverse the court of appeals insofar as it held that these forensic statements were admissible. However, because the court of appeals did not consider whether the admission of M.A.'s forensic statement to Marshall was harmless, we remand this case to the court of appeals to consider this issue.

**Relevant Background**

{¶ 3} In December 2005, Arnold and Wendy Otto lived together in Hilliard, Ohio, with their two young children. Otto testified that upon awakening one night, she discovered that Arnold and their four-year-old daughter, M.A., were locked in a bedroom. Otto demanded that Arnold unlock the door, and when

he did, she observed that his boxer shorts were halfway off. Otto also observed that M.A.'s underwear was around her ankles. She suspected sexual abuse, demanded that Arnold leave the premises, and called 9-1-1. Arnold left immediately. By the time paramedics arrived, many police officers were present. M.A. told firefighter-paramedic Charles Fritz that she had been touched in her private area.

{¶ 4} Paramedics took Otto and M.A. to Nationwide Children's Hospital, where evidence for a rape kit was collected. While at the hospital, Otto was advised to take M.A. to the CCFA the next day. The record is unclear whether this advice came from the police, paramedics, hospital personnel, or some other source. At some point that night, M.A. was released.

{¶ 5} The next morning, Otto took M.A. to the CCFA. The CCFA is part of Children's Hospital and is located across the street from the main hospital. At the CCFA, Marshall, a Nationwide Children's Hospital employee, interviewed M.A. M.A.'s responses to Marshall's questions indicated that she had been sexually abused. This interview is at the heart of Arnold's Confrontation Clause claim.

{¶ 6} The interview yielded a variety of relevant information. For example, M.A. stated that Arnold's "pee-pee" went inside her "pee-pee" and that Arnold's mouth touched her "pee-pee." These statements were necessary for M.A.'s medical evaluation and treatment. But M.A. also answered questions that related to the ongoing investigation. For example, in response to Marshall's questions, M.A. stated that Arnold closed and locked the bedroom door before raping her and that Arnold removed her underwear.

{¶ 7} After the interview with Marshall, M.A. was physically examined by a pediatric nurse practitioner, Gail Horner, a hospital employee who worked in the CCFA. Horner found two abrasions to M.A.'s hymen, which she concluded had

been caused by acute trauma, likely from penetration, within the previous 24 to 72 hours. Horner testified that the abrasions were "diagnostic" of sexual abuse.

{¶ 8} Based on this and other information, including Otto's testimony, Arnold was indicted on two counts of rape in violation of R.C. 2907.02. The first count charged rape by vaginal intercourse; the second charged rape by cunnilingus.

{¶ 9} At trial, the court determined that M.A. was unavailable to testify. After watching the DVD recording of M.A.'s interview with Marshall, the court determined that the statements had been made for the purpose of medical diagnosis and were admissible hearsay under Evid.R. 803(4). The court also determined that the statements were not barred by the Confrontation Clause. Accordingly, the DVD was played for the jury.

{¶ 10} The jury found Arnold guilty of rape by vaginal intercourse, but not guilty of rape by cunnilingus. R.C. 2907.02. Arnold was sentenced to life in prison.

{¶ 11} On appeal, the Tenth District affirmed Arnold's conviction. *State v. Arnold*, Franklin App. No. 07AP-789, 2008-Ohio-3471. We accepted Arnold's discretionary appeal to determine whether, in a criminal prosecution, the out-of-court statements made by a child to an interviewer employed by a child-advocacy center violates the right to confront witnesses provided by the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. *State v. Arnold*, 120 Ohio St.3d 1452, 2008-Ohio-6813, 898 N.E.2d 967.

## Analysis

### *Confrontation Clause*

{¶ 12} "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted

4

with the witnesses against him.' We have held that this bedrock procedural guarantee applies to both federal and state prosecutions. *Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)." *Crawford v. Washington* (2004), 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177. "Section 10, Article I [of the Ohio Constitution] provides no greater right of confrontation than the Sixth Amendment." *State v. Self* (1990), 56 Ohio St.3d 73, 79, 564 N.E.2d 446.

{¶ 13} In *Crawford*, the Supreme Court of the United States considered whether the introduction of a hearsay statement admissible under state law violated a defendant's Sixth Amendment right to confront the witnesses against him. The court held that out-of-court statements violate the Sixth Amendment when they are testimonial and the defendant has had no opportunity to cross-examine the declarant. 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177. See also *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶ 21-26. The court did not comprehensively define "testimonial" but stated that the core class of testimonial statements includes statements " 'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *Crawford*, 541 U.S. at 52, quoting Brief of Amicus Curiae National Association of Criminal Defense Lawyers 3. Accord *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, paragraph one of the syllabus. The court emphasized that the objective-witness test was but one of many possible ways to determine whether a statement is testimonial, and it expressly stated, "We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Crawford*, 541 U.S. at 68.

{¶ 14} Two years later, in *Davis v. Washington* (2006), 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224, the court considered whether a caller's responses to a dispatcher's interrogation during a 9-1-1 telephone conversation

were testimonial when the caller failed to appear to testify at trial. The court stated (1) that the statements described the events as they were happening, as opposed to explaining events that had happened in the past, (2) that any reasonable listener would conclude that the statements were made in the face of an ongoing emergency, (3) that the interrogation was objectively necessary to resolve the ongoing emergency, and (4) that the interrogation was informal because it was conducted over the phone and the answers were provided frantically while in an unsafe environment. Id. at 827. The court concluded that the circumstances surrounding the interrogation "objectively indicate [that] its primary purpose was to enable police assistance to meet an ongoing emergency. [The caller] simply was not acting as a *witness;* she was not *testifying*." (Emphasis sic.) Id. at 828. Accordingly, the court concluded that the caller's hearsay statements were not testimonial and, therefore, that they were not barred by the Sixth Amendment. Id. at 829.

{¶ 15} In *Davis*, the court also considered a second case in which a domestic-violence complainant did not appear at trial. Id. at 819-820. The police officer who interviewed the victim at the scene of the incident and who witnessed her complete and sign an affidavit concerning the abuse testified at trial in order to authenticate the affidavit. Id. at 820. The court determined (1) that the interrogation sought to determine what had happened, not what was happening, (2) that there was no ongoing emergency, (3) that the interrogation was not needed to resolve an emergency, and (4) that the interrogation was "formal enough" that it was conducted in a room separate from the complainant's husband. Id. at 830. The court concluded that "[i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct – as, indeed, the testifying officer expressly acknowledged." Id. at 829. Accordingly,

the court concluded that the hearsay evidence was testimonial and, therefore, that it was barred by the Sixth Amendment. Id. at 834.

{¶ 16} The court held that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id. at 822. Accord *Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, paragraph one of the syllabus.

*Stahl*, *Muttart*, and *Siler*

{¶ 17} In *Stahl,* this court considered whether hearsay statements by a rape victim to a nurse practitioner during a medical examination at a hospital DOVE[1] unit were admissible when the victim was not available to testify at trial. *Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at ¶ 1. The defendant argued that the statements violated his Sixth Amendment right to confront witnesses. Id. at ¶ 1, 9. This court distinguished *Davis,* stating: "They involve statements made to law-enforcement officers, while the statement at issue here covers one made to a medical professional at a medical facility for the *primary* purpose of receiving proper medical treatment and not investigating past events related to criminal prosecution." (Emphasis sic.) Id. at ¶ 25. We concluded that the primary purpose of the examination was to receive medical treatment, not to investigate past events, applied the objective-witness test outlined in *Crawford*, and held that the challenged statements were nontestimonial. Id. at ¶ 47, 48.

---

1. "DOVE" stands for "Developing Options for Violent Emergencies." *Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at ¶ 2. The unit specializes in health-care services for victims of sexual assault and domestic disturbances. Id.

{¶ 18} In *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, a child victim of sexual abuse was interviewed by a social worker at a child-advocacy center. Id., ¶ 14-15. As in the case before us now, the social worker interviewed the child before she was examined by a doctor. Id., ¶ 15. During the interview, the child disclosed to the social worker that her father had put his penis in her mouth and had " 'put his pee-pee in her pee-pee.' " Id., ¶ 16. The child also disclosed that similar conduct had happened " 'a whole bunch of times.' " Id. We held that the child's statements were nontestimonial because "[s]tatements made to medical personnel for purposes of diagnosis or treatment are not inadmissible under *Crawford*." Id., ¶ 63. This is true because statements for medical diagnosis and treatment "are not even remotely related to the evils that the Confrontation Clause was designed to avoid." Id.

{¶ 19} In *Siler*, we considered whether statements made by a child to a sheriff's deputy in the course of a police interrogation were testimonial. *Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, at ¶ 2. We concluded that "the statements made to the deputy sheriff were testimonial because the circumstances objectively indicate that no ongoing emergency existed and that the primary purpose of the police interrogation was to establish past events potentially relevant to a later criminal prosecution." Id. We held that courts in Ohio should apply the primary-purpose test set forth in *Davis* to determine "whether a child declarant's statement made in the course of police interrogation is testimonial or nontestimonial." Id. at paragraph one of the syllabus, citing *Davis*, 547 U.S. at 821-822, 126 S.Ct. 2266, 165 L.Ed.2d 224.

*Other State Supreme Court Decisions*

{¶ 20} Since *Crawford*, many state supreme courts have considered whether statements made by children during interviews at child-advocacy centers,

8

or their functional equivalent, are testimonial and whether statements by child victims of sexual abuse for medical diagnosis and treatment are testimonial.

**{¶ 21}** We recognize that a number of those decisions held that statements by child-sexual-abuse victims at child-advocacy centers or their functional equivalent are testimonial and, therefore, inadmissible pursuant to the Confrontation Clause and *Crawford* when the defendant has no opportunity to cross-examine the victim at trial. See, e.g., *State v. Contreras* (Fla.2008), 979 So.2d 896; *State v. Hooper* (2007), 145 Idaho 139, 176 P.3d 911; *In re Rolandis G.* (2008), 232 Ill.2d 13, 327 Ill.Dec. 479, 902 N.E.2d 600; *State v. Bentley* (Iowa 2007), 739 N.W.2d 296; *State v. Henderson* (2007), 284 Kan. 267, 160 P.3d 776; *State v. Snowden* (2005), 385 Md. 64, 867 A.2d 314; *State v. Justus* (Mo.2006), 205 S.W.3d 872; *State v. Blue*, 2006 ND 134, 717 N.W.2d 558. But in each of these cases, the interviews were conducted solely for forensic purposes. The situation we are presented with in this case is distinct from those considered in the above-cited cases. Here we are asked to determine whether statements that contain distinct forensic and medical diagnostic information and were made to a social worker during one interview implicate the Confrontation Clause. For example, in *Contreras*, the Florida Supreme Court held that a statement taken by the coordinator of a "child protection team" ("CPT") was testimonial. Id. at 905. The interview was conducted and videotaped at a shelter for victims of domestic violence, and a police officer was connected electronically to the CPT coordinator in order to suggest questions. Id. There was no evidence that the child received medical treatment based on the interview. The court held that "the primary, if not the sole, purpose of the CPT interview was to investigate whether the crime of child sexual abuse had occurred, and to establish facts potentially relevant to a later criminal prosecution." Id.

{¶ 22} Similarly, the Illinois Supreme Court excluded statements made in a forensic interview when there was "absolutely no indication that * * * [the] interview * * * was conducted, to a substantial degree, for treatment rather than investigative purposes." *In re Rolandis G.*, 232 Ill.2d at 33, 327 Ill.Dec. 479, 902 N.E.2d 600. In that case, after stating that an older child forced him to perform fellatio, a six-year-old was taken to a child-advocacy center and was interviewed by a child advocate. Id. at 19. The interview was video recorded and observed by a detective through a one-way mirror. Id. As with *Contreras*, there was no indication that the child received a medical evaluation or treatment based on the interview. The Illinois Supreme Court concluded that "the interview took place at the behest of the police so that a more detailed account of the alleged sexual abuse could be obtained by a trained interviewer and memorialized on videotape" and held that the child's statements were testimonial. Id. at 32.

{¶ 23} In *Hooper*, the Idaho Supreme Court excluded statements in a video-recorded forensic interview taken at a Sexual Trauma Abuse Response Center ("STAR"). 145 Idaho at 141, 176 P.3d 911. In that case, a child was taken to the STAR center after her mother discovered the child and her father locked in the bathroom and suspected sexual abuse. Id. at 140. Upon arrival at the STAR center, the child met with a doctor and the doctor conducted a sexual-abuse examination. Id. at 141. After the medical examination, a forensic interviewer conducted a video-recorded interview with the child, which a detective observed via a closed-circuit system. Id. Because the interview occurred after the child met with and was examined by the physician, the subsequent interview served a forensic, not a medical or treatment-oriented, purpose.

{¶ 24} In the same vein, the Kansas Supreme Court held that a child's statements during an interview conducted by a detective and a social worker, both members of the Exploited and Missing Children Unit, were testimonial.

10

*Henderson*, 284 Kan. at 294, 160 P.3d 776. In *Henderson*, a mother took her three-year-old daughter to a medical clinic after noticing discharge from the child's vagina and after the child complained that her "potty place" hurt. Id. at 269. Test results revealed that the child had gonorrhea. Id. After learning about the test results, the detective and social worker interviewed the child, who disclosed that her mother's boyfriend had "touched her 'potty in a bad way.' " Id. at 270. This interview was video and audio recorded. Id. Again, there is no indication that the child received additional medical treatment based on the interview.

{¶ 25} These cases that stand for the proposition that the admission of statements obtained during interviews at CACs or their functional equivalents result in violations of the Confrontation Clause when the declarant is unavailable at trial arise from scenarios in which the statements at issue were solely for forensic purposes, rather than for ameliorative or therapeutic ones.

{¶ 26} In the latter category, our sister courts hold that statements made by child-sexual-abuse victims for the purpose of medical diagnosis and treatment are not testimonial and, therefore, do not implicate the Confrontation Clause even if they are used subsequently by the state in a prosecution. *Seely v. State* (2008), 373 Ark. 141, 282 S.W.3d 778 (holding that a child's statements about abuse to a social worker at a children's hospital before the child was examined by a doctor were nontestimonial); *State v. Arroyo* (2007), 284 Conn. 597, 935 A.2d 975 (holding that statements made to a social worker were nontestimonial because the primary purpose of the interview was to provide medical assistance to the child); *State v. Krasky* (Minn.2007), 736 N.W.2d 636 (holding that a child's statements to a nurse alleging sexual abuse were nontestimonial because the nurse's primary purpose was to assess and protect the child's health and welfare); *State v. Spencer*, 339 Mont. 227, 2007 MT 245, 169 P.3d 384 (holding that statements to a

counselor regarding sexual abuse were nontestimonial); *People v. Vigil* (Colo.2006), 127 P.3d 916 (holding that responses to questions by a doctor as part of a sexual-assault examination were nontestimonial); *Commonwealth v. DeOliveira* (2006), 447 Mass. 56, 849 N.E.2d 218 (holding that statements to a physician were made for the purposes of medical evaluation and treatment and were not testimonial); *Hobgood v. State* (Miss.2006), 926 So.2d 847 (holding that a child's description of sexual abuse to his doctor was not given for the purpose of prosecuting the accused and was not testimonial); *State v. Vaught* (2004), 268 Neb. 316, 682 N.W.2d 284 (holding that a child's statements to an emergency-room physician identifying the perpetrator of sexual assault were nontestimonial).

{¶ 27} With this background in mind, we turn to whether M.A.'s statements to Marshall were testimonial.

{¶ 28} Pursuant to *Stahl*, *Muttart*, and *Siler*, to determine whether M.A.'s statements to Marshall were testimonial, we must identify the primary purpose of the statements. Statements made for the purpose of medical diagnosis and treatment are nontestimonial. *Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 63. However, statements made to agents of the police for the primary purpose of forensic investigation are testimonial. *Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, at ¶ 2.

*Child-Advocacy Centers and the CCFA*

{¶ 29} The objective of a child-advocacy center like the CCFA is neither exclusively medical diagnosis and treatment nor solely forensic investigation. " 'The purpose of a Children's Advocacy Center is to provide a comprehensive, culturally competent, multidisciplinary response to allegations of child abuse in a dedicated, child friendly setting.' " Nancy Chandler, Children's Advocacy Centers: Making a Difference One Child at a Time (2006), 28 Hamline J.Pub.L.

& Policy 315, quoting National Children's Alliance, Accreditation Guidelines for Children's Advocacy Centers (2004) 5.

**{¶ 30}** "Prior to the development of the Children's Advocacy Center model, 'traditional child abuse investigations often subject(ed) the child to multiple interviews.' " Id. at 332, quoting Lisa Snell, Child Advocacy Centers: One Stop on the Road to Performance-Based Child Protection (June 2003) 1. A child-advocacy center's " 'number one goal' " is to reduce trauma to a child-abuse victim by coordinating the interview to include professionals from multiple agencies, which, in turn, can reduce the number of interviews needed and improve the quality of the investigation, the diagnosis, and the recommendation for treatment. Id. at 323. Additionally, " '[t]hey help children avoid the trauma of repeating their story at various stops along the legal and judicial path.' " Id. These interdisciplinary teams often include law-enforcement professionals, prosecutors, medical and mental-health personnel, and child advocates. Id. at 324.

**{¶ 31}** At the CCFA, Marshall, a social worker employed by Nationwide Children's Hospital, interviews children who are suspected victims of physical or sexual abuse. The purpose of the interview is to gather as much information as possible. The interview is both recorded on a DVD and transmitted to another room via closed-circuit television. Typically, a nurse practitioner or doctor, a children's services caseworker, and a law-enforcement representative watch the interview from a separate room. Marshall does not inform the child that the team members are watching the interview, but does tell him or her that he or she will be examined by a doctor or nurse after the interview.

**{¶ 32}** After Marshall interviews the child, she meets with the doctor or nurse practitioner who will perform the medical examination to review the child's statements. The nurse or doctor conducts the appropriate medical examination based on the child's statements during the interview. The nurse or doctor relies

on information obtained during Marshall's interview to determine what examination and tests are needed. For example, information regarding the identity of the perpetrator, the age of the perpetrator, the type of abuse alleged, and the time frame of the abuse allows the doctor or nurse to determine whether to test the child for sexually transmitted infections.

*The Interviewer's Dual Capacity*

**{¶ 33}** Child-advocacy centers are unique. Multidisciplinary teams cooperate so that the child is interviewed only once and will not have to retell the story multiple times. Most members of the team retain their autonomy. Neither police officers nor medical personnel become agents of the other. However, to ensure that the child victim goes through only one interview, the interviewer must elicit as much information from the child as possible in a single interview and must gather the information needed by each team member. Thus, the interview serves dual purposes: (1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim. The interviewer acts as an agent of each member of the multidisciplinary team.

1

**{¶ 34}** Certainly, some of the statements that M.A. made to Marshall primarily served a forensic or investigative purpose. Those statements include M.A.'s assertion that Arnold shut and locked the bedroom door before raping her; her descriptions of where her mother and brother were while she was in the bedroom with Arnold, of Arnold's boxer shorts, of him removing them, and of what Arnold's "pee-pee" looked like; and her statement that Arnold removed her underwear. These statements likely were not necessary for medical diagnosis or treatment. Rather, they related primarily to the state's investigation. Marshall

effectively acted as an agent of the police for the purpose of obtaining these statements.

{¶ 35} Because Marshall acted as an agent of the police in obtaining these statements, pursuant to *Davis* and *Siler*, we must employ the primary-purpose test to determine whether the primary purpose of the interrogation was " 'to enable police assistance to meet an ongoing emergency.' " *Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, at paragraph one of the syllabus, quoting *Davis*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224. We hold that it was not. First, the statements involved a description of past events. The alleged abuse occurred the previous evening, and the questioning specifically attempted to obtain a description of the abuse. Second, a reasonable observer would not perceive an ongoing emergency at the time of questioning. The patient had been discharged from the hospital the previous evening. At oral argument, counsel conceded that no medical emergency existed at the time of Marshall's interview. Third, the questioning was not objectively necessary to resolve an emergency because there was no ongoing emergency. Finally, the interview was rather formal, more akin to the videotaped, planned interview of *Crawford* than to the frantic 9-1-1 call or the sequestered but spur-of-the-moment interview recounted in *Davis*.

{¶ 36} The primary purpose of that portion of the interview was not to meet an ongoing emergency but, rather, to further the state's forensic investigation. Thus, these statements were testimonial in nature and their admission without a prior opportunity for cross-examination is prohibited by the Confrontation Clause. *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177.

2

{¶ 37} Although the statements obtained during Marshall's interview of M.A. that related primarily to the state's forensic investigation are testimonial and thus inadmissible pursuant to *Crawford*, other statements provided information that was necessary to diagnose and medically treat M.A. The history obtained during the interview is important for the doctor or nurse practitioner to make an accurate diagnosis and to determine what evaluation and treatment are necessary. For example, the nurse practitioner conducts a "head to toe" examination of all children, but only examines the genital area of patients who disclose sexual abuse. That portion of the exam is to identify any trauma or injury sustained during the alleged abuse.

{¶ 38} M.A.'s statements that described the acts that Arnold performed, including that Arnold touched her "pee-pee," that Arnold's "pee-pee" went inside her "pee-pee," that Arnold's "pee-pee" touched her "butt," that Arnold's hand touched her "pee-pee," and that Arnold's mouth touched her "pee-pee," were thus necessary for the proper medical diagnosis and treatment of M.A.

{¶ 39} In his dissent, Justice Pfeifer states that he is troubled by our conclusion that these statements were medically necessary because M.A. had been examined at the hospital on the night of the rape. However, although M.A. was taken to the hospital on the night of the rape, the record establishes only that a rape-kit examination was performed, not that she was examined for medical diagnosis or treated. M.A. was referred to the CCFA for further medical examination and treatment. Justice Pfeifer also contends that the nurse practitioner who examined M.A. after the interview would have asked all medically relevant questions during the examination. This is not true. The history obtained during Marshall's interview was necessary for the nurse practitioner to make an accurate diagnosis and to determine what treatment was necessary. Horner, the nurse practitioner who examined M.A., testified that the "forensic

16

interview guides my exam in that it lets me know whether or not I need to test the child for sexually transmitted infection. For instance, if a child says that a penis touched their vagina, it means to me that I need to test to make sure that child didn't get a sexually transmitted infection."

{¶ 40} In eliciting these medically necessary statements, Marshall acted as an agent of the nurse practitioner who examined M.A., not of the investigating police officers. Because Marshall did not act as an agent of the police in obtaining these statements, they are not inadmissible pursuant to *Davis*. *Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at ¶ 25, 36.

{¶ 41} Statements made for medical diagnosis and treatment are nontestimonial. *Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 63. There is no basis in the law for concluding that Marshall's dual capacity renders statements made by M.A. for the purpose of medical diagnosis and treatment inadmissible pursuant to the Confrontation Clause. Indeed, in *Davis*, the United States Supreme Court acknowledged that the same interview or interrogation might produce both testimonial and nontestimonial statements. *Davis*, 547 U.S. at 828-829, 126 S.Ct. 2266, 165 L.Ed.2d 224. As the court stated in *Davis*, "This presents no great problem." Id. at 829. "[T]rial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial. Through *in limine* procedure, they should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence." Id.

{¶ 42} Both dissents criticize our reliance on *Davis* in support of our conclusion that although M.A.'s forensic statements to Marshall were testimonial, her statements for the purpose of medical diagnosis and treatment were properly admitted. First, Justice Pfeifer argues that pursuant to *Davis*, when evidence

includes testimonial and nontestimonial statements, the testimonial statements must be redacted or excluded to avoid violating the defendant's right to confront witnesses against him. We agree that M.A.'s testimonial statements should have been excluded, and we remand the case to the court of appeals to determine whether the admission of M.A.'s testimonial statements was harmless error. Next, both dissents argue that our reliance on *Davis* is erroneous because we examine the statements on a question-by-question basis and the testimonial and nontestimonial statements were interspersed, rather than being obtained in separate and distinct portions of the interview. Justice Pfeifer argues that this will make it difficult to distinguish the statements that should be redacted from those that may be properly admitted. However, our guiding consideration is the purpose for which the statements are made, not the order in which they are obtained. Finally, both dissents note that unlike in *Davis*, there was no ongoing emergency in this case and, therefore, there was no occasion for the questioning in this case to evolve from nontestimonial to testimonial. Our decision is not based on the evolution of M.A.'s statements, but on the fact that the statements were made for different purposes. The fact that *Davis* involved an evolution from nontestimonial to testimonial statements does not preclude its application in instances in which an interview simultaneously serves dual purposes.

{¶ 43} Further, the fact that police officers watched the interview and that it was recorded does not change the fact that the statements were necessary for M.A.'s medical diagnosis and treatment. Similarly, the fact that information gathered for medical purposes is subsequently used by the state does not change the fact that the statements were made for medical diagnosis and treatment. *Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 62. M.A.'s statements that were necessary for medical diagnosis and treatment were

nontestimonial and were properly admitted without violating Arnold's Confrontation Clause rights.

**Conclusion**

{¶ 44} When Marshall interviewed M.A. at the CCFA, she occupied dual capacities: she was both a forensic interviewer collecting information for use by the police and a medical interviewer eliciting information necessary for diagnosis and treatment. We hold that statements made to interviewers at child-advocacy centers that are made for medical diagnosis and treatment are nontestimonial and are admissible without offending the Confrontation Clause. Thus, we affirm the judgment of the court of appeals to the extent that M.A.'s statements to Marshall for the purpose of medical treatment and diagnosis were properly admitted. We further hold that statements made to interviewers at child-advocacy centers that serve primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause when the declarant is unavailable for cross-examination at trial. We agree with Arnold that the trial court erred in admitting the forensic statements made by M.A. to Marshall and reverse the court of appeal's judgment insofar as it held that these forensic statements were admissible. However, because the court of appeals did not consider whether the admission of M.A.'s forensic statement to Marshall was harmless, see *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, we remand the case to the court of appeals to consider this issue.

Judgment affirmed in part
and reversed in part,
and cause remanded.

LUNDBERG STRATTON, LANZINGER, and CUPP, JJ., concur.

PFEIFER and O'DONNELL, JJ., dissent.

BROWN, C.J., not participating.

_____

**PFEIFER, J., dissenting.**

{¶ 45} The majority opinion misconstrues the applicable case law in reaching its conclusion. I conclude that a forensic interview cannot be both testimonial and nontestimonial without violating a defendant's Sixth Amendment right to confront the witnesses against him.

{¶ 46} The majority opinion ably explains the law of the Sixth Amendment's Confrontation Clause as elucidated by various federal and Ohio cases. I will not redescribe these cases. The majority opinion also fairly characterizes the case law from other states that it summarizes in the section titled "Other State Supreme Court Decisions." I dissent, not based on the majority opinion's understanding of the law, but because of the way the majority opinion applies the law to this case.

{¶ 47} The majority opinion acknowledges that many of the questions asked by the forensic interviewer, Kerri Marshall, were asked "to gather forensic information" and are, therefore, testimonial. In *Davis v. Washington* (2006), 547 U.S. 813, 828-829, 126 S.Ct. 2266, 165 L.Ed.2d 224, the court held that statements of a witness who is unavailable for cross-examination should be redacted or excluded to avoid violating the defendant's right to confront witnesses against him. The testimonial statements in this case were not redacted or excluded. Furthermore, the testimonial statements in this case are different from those discussed in *Davis*. In *Davis*, the testimonial statements were made after a series of nontestimonial statements had concluded. Id. The interrogator in that case had elicited statements to assist the police in meeting an ongoing emergency: those statements were nontestimonial, and their admission as evidence was permissible. Id. After eliciting the initial statements, the interrogator asked a series of questions attempting to elicit information about the alleged crime. Id. at

828. The court found "no great problem" with this approach because the nontestimonial statements were separate and distinct from the testimonial statements. Id. at 829. The court stated that questioning could evolve from addressing an emergency to eliciting forensic information. Id. at 828. According to the Supreme Court, testimonial statements may not be introduced as evidence and if they are part of a transcript or other document, they must redacted. Id. at 829.

{¶ 48} The majority opinion makes creative use of the *Davis* opinion. First, it concludes that the concept of nontestimonial statements evolving into testimonial statements applies when an interrogator has a dual purpose. *Davis* does not support this conclusion. The interrogator in *Davis* did not have dual purposes: she had two separate purposes. She completed the questions regarding the ongoing emergency and then moved on to elicit information that could be used as evidence. Marshall's questions, which elicited, in the opinion of the majority, both testimonial and nontestimonial statements, were interspersed, rendering it difficult to distinguish those that should be redacted from those that need not be redacted. Second, in this case there was no ongoing emergency. The emergency occurred the night before, so there was no occasion for the questioning to evolve from eliciting nontestimonial statements to eliciting testimonial ones. Third, the testimonial statements in this case, which the majority opinion concedes exist, were not redacted. The majority opinion relies on *Davis*, but only to the extent that *Davis* suits its purposes.

{¶ 49} Although remanding the cause to enable the court of appeals to determine whether the error is harmless is better than finding it harmless, we should do neither. It is clear from the record that the error in this case was not harmless. In *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78, we stated that the determination of whether a constitutional error is

harmless "is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." It is patently obvious that the testimonial statements in this case "might have contributed to the conviction."

{¶ 50} Another troubling aspect of the majority opinion is its implicit conclusion that Marshall's questions were medically necessary. Although I concede that they may have been helpful, they were not necessary. First, a doctor had examined M.A. the previous evening. That doctor would have done and asked everything necessary to treat M.A. at that time. See *State v. Hooper* (2007), 145 Idaho 139, 141, 176 P.3d 911, about which the majority opinion states, "Because the interview occurred after the child met with and was examined by the physician, the subsequent interview served a forensic, not a medical or treatment-oriented, purpose." Majority opinion at ¶ 23. Second, as discussed below, a nurse practitioner examined M.A. after Marshall's questioning. She would have asked all medically relevant questions during her examination.

{¶ 51} The testimonial statements in this case were neither redacted nor harmless. Nevertheless, the majority opinion concludes that the testimonial statements do not violate the defendant's right to confront witnesses. I will now explain why I believe that all of the statements elicited by Marshall were testimonial and, therefore, improperly admitted into evidence.

**Marshall's Interview with M.A.**

{¶ 52} Kerri Marshall is a licensed social worker employed by CCFA as a medical forensic interviewer. Marshall described her job duties as interviewing children who are alleged to be victims of sexual or physical abuse. She testified that law-enforcement personnel customarily observe the interviews that she conducts and that the children are not aware that they are being observed.

22

Marshall's interview with M.A. was contemporaneously broadcast to another room over closed-circuit television, where it was viewed by several people, including a police detective. It was also recorded on a DVD.

{¶ 53} During her interview with M.A., Marshall asked many questions about the events of the previous evening. Some of the questions were not relevant to an ongoing medical emergency or to medical treatment. For example, Marshall asked M.A., "How did your underwear get off?" "Did daddy's pee-pee touch your pee-pee?" and "Were you laying down or sitting up when daddy played pee-pees with you?" Marshall subsequently prepared a report of the interview, entitled "Medical Forensic Interview Summary." In this report, Marshall noted that Arnold "fled the home by stealing [Otto's] purse and her car" after Otto confronted him. Marshall recommended that M.A. be "protected from any contact with alleged perpetrator as this investigation continues."

### Statement made in the course of a police interrogation

{¶ 54} The issue in this case, as it was in *Stahl* and *Siler*, is to determine whether the hearsay statements that were offered by the prosecution and that the defendant argued violated his right under the Sixth Amendment to confront a witness are testimonial. A threshold question, however, is whether the statements were made in the course of a police interrogation. See *Davis*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224; *Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, at ¶ 30-31. What constitutes "police interrogation" for purposes of Confrontation Clause analysis has not been addressed by the United States Supreme Court. See *Davis* at 823, fn. 2.

{¶ 55} It is, of course, plainly obvious that a police officer did not conduct the interrogation in this case; social worker Kerri Marshall conducted the interrogation. The question becomes: was Marshall an agent of law enforcement

when she conducted the interrogation? Id. For the reasons that follow, I conclude that she was.

{¶ 56} Although the state argues that *Crawford* and *Davis* apply only when the interviewer is a law-enforcement officer, the cases do not support such a narrow interpretation. I am persuaded that *Crawford* and *Davis* define a broader constitutional protection from out-of-court statements that are obtained primarily to assist in a criminal prosecution, regardless of whether the interrogator is a police officer or an agent of the police. *Davis*, 547 U.S. at 822-823, 126 S.Ct. 2266, 165 L.Ed.2d 224; *Crawford*, 541 U.S. at 51-53, 124 S.Ct. 1354, 158 L.Ed.2d 177. See *Crawford* at 50 ("the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused").

{¶ 57} In *Siler*, we stated that "courts have consistently applied the primary-purpose test to statements that a child declarant made to police or those determined to be police agents." *Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, at ¶ 29. In one of those cases, the Supreme Court of North Dakota stated, "In cases since *Crawford*, other states with the functional equivalent of the Children's Advocacy Center ('CAC') involved in this case have held that similar statements made by a child with police involvement inevitably are testimonial." *State v. Blue* (2006), 199 N.D. 50, 717 N.W.2d 558, ¶ 15. A Florida court of appeals has considered four factors to determine whether the interrogation at issue was "the functional equivalent of a police interrogation. These four factors are (1) the effect of the Florida statutes pertinent to the establishment and functioning of the CPT [the Florida equivalent of a CAC], (2) the nature and extent of law enforcement involvement in the examination of the child by [the nurse practitioner] at [the hospital], (3) the purpose of the examination performed by [the nurse practitioner] in her capacity as a member of the CPT, and (4) the

absence of any ongoing emergency at the time [the nurse practitioner] conducted her examination of the child." *Hernandez v. State* (Fla.App.2007), 946 So.2d 1270, 1280. Although I would not adopt this four-part test, the factors are helpful in determining whether Marshall was acting as an agent of the police when she interrogated M.A.

{¶ 58} First, the statutory scheme that authorized the creation of CACs contains provisions that establish a link between the CACs and law enforcement. R.C. 2151.426 and 2151.427. See Ohio Adm.Code 5101:2-33-26. Second, a police detective watched the interrogation as it was happening and the interrogation was recorded and saved to a DVD. Third, focusing primarily on issues that were not medical, the interview was memorialized as a "Medical Forensic Interview Summary," suggesting that the purpose was forensic, not medical. Fourth, there was no ongoing emergency while the interview was conducted.

{¶ 59} Furthermore, Marshall is not a medical professional; her job title is "medical forensic interviewer." "Forensic" means "[u]sed in or suitable to courts of law or public debate." Black's Law Dictionary (9th Ed.2009) 721. The Michigan Department of Human Services has stated that "[t]he goal of a forensic interview is to obtain a statement from a child * * * that will support accurate and fair decision-making in the criminal justice and child welfare systems," and that "the interview is not part of a treatment process." State of Michigan, Forensic Interviewing Protocol, at http://www.michigan.gov/documents/dhs/DHS-PUB-0779_211637_7.pdf (accessed May 25, 2010).

{¶ 60} I conclude that Marshall was an agent of the police when she conducted her forensic interview of M.A. See *Blue*, 2006 ND 134, 717 N.W.2d 558, ¶ 14 – 16, and the cases cited therein; *State v. Mack* (2004), 337 Or. 586,

593, 101 P.3d 349 (Department of Human Services caseworker was a proxy for the police).

### Application of the primary-purpose test

{¶ 61} The next step is to determine whether the primary purpose of the interrogation was " 'to enable police assistance to meet an ongoing emergency.' " *Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, at paragraph one of the syllabus, quoting *Davis*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224. First, the interview involved a description of past events. The alleged abuse had occurred the previous evening, and the questioning specifically attempted to obtain a description of the abuse. Second, a reasonable observer would not perceive an ongoing emergency at the time of questioning. The patient had been discharged from the hospital the previous evening. At oral argument, counsel conceded that no medical emergency existed at the time of Marshall's interview. Third, the questioning was not necessary to resolve an emergency because there was no ongoing emergency. Finally, the interview was rather formal, more akin to the videotaped, planned interview of *Crawford* than to the frantic 9-1-1 call or the sequestered but spur-of-the-moment interview recounted in *Davis*. Each factor independently suggests that there was no ongoing emergency; collectively, the conclusion is manifest.

{¶ 62} Because the primary purpose of the Marshall interview was not to meet an ongoing emergency, the next step is to evaluate the entirety of the factual circumstances surrounding the interview to establish whether its primary purpose was "to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 63} A CAC can be established only by a children's services agency, law enforcement, or a prosecutor, and the CAC is responsible for assembling a multidisciplinary team. R.C. 2151.426 and 2151.427(A). The multidisciplinary

team must include law enforcement and prosecuting attorneys as members. Id. The statutory connection between CACs and law enforcement suggests that CACs are not solely medical-treatment providers and that a CAC interviewer can be an agent of the police.

{¶ 64} The circumstances of the interview indicate that its primary purpose was "to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224. See *Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, paragraph one of the syllabus. Police observed the interview, which the state concedes is a customary practice. A DVD recording of the interview was preserved, a strong indication that the purpose of the interview was to obtain evidence for use by the prosecution. I am unaware of doctors videotaping patient interviews to assist them in medical treatments or of doctors allowing police officers to routinely observe them when they examine their patients.

{¶ 65} Furthermore, many of the questions asked were investigatory in nature and similar to the questions asked in a direct examination in a judicial proceeding. See *Davis*, 547 U.S. at 830, 126 S.Ct. 2266, 165 L.Ed.2d 224. For example, questions about how the underwear was removed, who did so, and the specific positions – standing up or lying down – in which the alleged abuse occurred represent an attempt to gain specific details of past events. If the questions have a medical purpose, it is secondary to their investigatory purpose. I might view Marshall's questions differently if she were a nurse, as in *Stahl*, but she is not. Furthermore, the nurse practitioner would have made all inquiries relevant to medical treatment during the physical examination after the social worker questioned M.A. That the nurse practitioner stated that Marshall's interview "guides my exam" is no doubt true to some degree. But nurse practitioners are highly educated professionals; they do not need an intermediary.

In my opinion, the intermediary was interjected in order to elicit forensic evidence, not to assist in the medical examination.

{¶ 66} It is objectively apparent from the record that Marshall asked questions to assist in the police investigation. The circumstances of this case are quite different from *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 62, in which hearsay statements obtained by medical personnel in the course of treatment survived a Sixth Amendment challenge. In *Muttart*, police did not observe the interview and the interview was not videotaped. The state argues that the questions that Marshall asked M.A. helped to assess the need for future counseling but fails to show whether any counseling occurred. Even if it had occurred, a recommendation for counseling alone would be insufficient to establish that the interview was primarily for medical purposes.

{¶ 67} The critical evidence in this case is Marshall's report, something the majority opinion does not address. It uses the words "perpetrator" and "allegations" and includes a witness list, an item typically not found in a medical report. The report states that the patient should have no contact with the "alleged perpetrator as this investigation continues." The report indicates that Marshall believed that she was assisting an ongoing investigation targeting a particular criminal suspect. When interviewers believe themselves to be participants in an investigation that has targeted a particular criminal suspect, they conduct precisely the type of ex parte examinations that the Confrontation Clause protects against. *Crawford*, 541 U.S. at 50-53, 124 S.Ct. 1354, 158 L.Ed.2d 177.

**Conclusions reached by sister states**

{¶ 68} Since *Crawford* was decided, many state supreme courts have addressed the issue before us. In at least eight cases, state supreme courts have concluded that out-of-court statements by child sexual-assault victims to various non-law-enforcement personnel were nontestimonial. *Seely v. State* (2008), 373

Ark. 141, 282 S.W.3d 778; *People v. Vigil* (Colo.2006), 127 P.3d 916; *State v. Arroyo* (2007), 284 Conn. 597, 935 A.2d 975; *Commonwealth v. DeOliveira* (2006), 447 Mass. 56, 849 N.E.2d 218; *State v. Krasky* (Minn.2007), 736 N.W.2d 636; *Hobgood v. State* (Miss.2006), 926 So.2d 847; *State v. Spencer* (2007), 339 Mont. 227, 2007 MT 245, 169 P.3d 384; *State v. Vaught* (2004), 268 Neb. 316, 682 N.W.2d 284. Each of these cases turned on factual determinations that are not present in this case. See, e.g., *Seely*, 373 Ark. at 156, 282 S.W.3d 778 (the primary purpose of an interview conducted by a social worker "was medical treatment"); *Vigil*, 127 P.3d at 927 (statements to doctor were for purposes of medical diagnosis); *Hobgood*, 926 So.2d at 852 (statements were made to people who "were not working in connection with the police" or were made for the purpose of seeking medical treatment).

{¶ 69} At least nine state supreme courts have concluded that out-of-court statements by child sexual assault victims to non-law-enforcement personnel are testimonial. *State v. Contreras* (Fla.2008), 979 So.2d 896; *Hooper*, 145 Idaho 139, 176 P.3d 911; *In re Rolandis G.*, 232 Ill.2d 13, 327 Ill.Dec. 479, 902 N.E.2d 600; *State v. Bentley* (Iowa 2007), 739 N.W.2d 296; *State v. Henderson* (2007), 284 Kan. 267, 160 P.3d 776; *State v. Snowden* (2005), 385 Md. 64, 867 A.2d 314; *State v. Justus* (Mo.2006), 205 S.W. 3d 872; *Blue*, 2006 ND 134, 717 N.W.2d 558; *Mack*, 337 Or. 586, 101 P.3d 349. Each of these cases involves an interviewer who performed in circumstances substantially similar to the facts before us. See, e.g., *Blue*, 2006 ND 134, 717 N.W.2d 558, ¶ 2-3 (a forensic interviewer conducted the interview while a police officer watched; the officer was given a videotaped recording of the interview); *Contreras*, 979 So.2d at 905 (interview by child-protection-team coordinator was watched by police officer and recorded); *Bentley*, 739 N.W.2d at 297, 300 (interview by counselor at child-protection center was watched by police officers, who took videotaped copy of

interview with them). My conclusion in this case is bolstered by the fact that the majority of our sister courts that have considered substantially the same issue have reached the same conclusion that I reach.

## Conclusion

{¶ 70} I conclude that the primary purpose of Marshall's forensic interview was to establish or prove past events potentially relevant to later criminal prosecution. I conclude, therefore, that the statements were testimonial and that their admission violated the Confrontation Clause of the Sixth Amendment to the United States Constitution. I would reverse the decision of the court of appeals. I dissent.

_____

**O'DONNELL, J., dissenting.**

{¶ 71} The issue in this case concerns whether the trial court violated Michael Arnold's constitutional right to confront the witnesses against him when it admitted hearsay statements that Arnold's four-year-old daughter, M.A., made to Kerri Marshall, a medical forensic interviewer at the Center for Child and Family Advocacy at Nationwide Children's Hospital, who interviewed M.A. as part of the investigation into allegations of sexual abuse. I agree with the majority that Marshall acted as an agent of law enforcement when she interviewed M.A. because Marshall had a purpose to collect information for use by the police. However, because the majority also decides that Marshall simultaneously acted as an agent of medical professionals, rendering M.A.'s statements relevant to diagnosis and treatment nontestimonial, notwithstanding Marshall's primary purpose to collect that same information for the police, I respectfully dissent.

## Facts and Procedural History

{¶ 72} Michael Arnold and Wendy Otto married in their teens and had two children: a girl, M.A., who was four years old at the time relevant to this case, and

a boy, M.S.A., who was five. The couple had a volatile relationship, which included physical violence, accusations of infidelity, and an unsubstantiated claim that Arnold had abused M.S.A. According to Arnold's mother, Wendy had made up stories involving the children to get back at Arnold for cheating on her. After Wendy filed for divorce in July 2005, Arnold moved to Ohio. However, the two reconciled, and in November 2005, she followed him to Ohio.

{¶ 73} On the evening of December 7, 2005, Wendy fell asleep in the living room with M.S.A, but noises upstairs woke her, and she went to the bedroom to investigate. Arnold, however, had locked the bedroom door, and she yelled for him to open it. Once he did, she saw his "boxers halfway off on his side" and M.A. lying on the couple's air mattress. She pulled a blanket off of M.A. and discovered her daughter's underwear around her ankles. At that point, she told Arnold to leave. He told Wendy that nothing happened, but he left the house when she called 9-1-1. Paramedics and officers responded, and M.A. told firefighter-paramedic Charles Fritz that someone touched her private area. Fritz took Wendy and both children to the emergency room at Children's Hospital, where authorities performed a rape-kit examination on M.A.

{¶ 74} Wendy received instructions to take M.A. to the Center for Child and Family Advocacy at Children's Hospital (the "CCFA") the next morning. The CCFA is a child-advocacy center, which is defined by R.C. 2151.425(A) to mean "a center operated by participating entities * * * to perform functions and activities and provide services * * * regarding reports * * * of alleged sexual abuse of a child or another type of abuse of a child." Pursuant to R.C. 2151.426(A), the participating entities operating a child-advocacy center may include children's services, law enforcement, and the prosecuting attorney. The Columbus Police Department, the prosecutor, and children's services all have offices in the CCFA building.

**{¶ 75}** Kerri Marshall, a medical forensic interviewer working for the CCFA, interviews children when there are allegations of sexual or physical abuse. These interviews are recorded on DVD and observed on closed-circuit television by the nurse or doctor who will perform a physical examination, law enforcement, a children's services caseworker, and sometimes a prosecutor. According to Marshall, her interview is for purposes of medical diagnosis and treatment. However, she also explained the purpose of having doctors, nurses, detectives, children's services caseworkers, and prosecutors watch the interview: "Before we were all in the same building. You know, we would do the same process. I would interview the children. They would have their medical exam done. We would forward our reports on to medical services, law enforcement. They will have to review [—] law enforcement may have to interview the child. So in this way we set it up so the child will have to go through one interview. The child won't have to relive the story again. So that's really the purpose of having the other — the other people there watching the interview." Thus, the interview had a goal to obtain enough information so that law enforcement would not have to reinterview the child.

**{¶ 76}** In this case, Gail Horner, a nurse practitioner, Monte Nommay, a police detective, Joelle Nielson, a victim advocate, and Vanise Dunn, a children's services caseworker, observed the interview. Marshall interviewed M.A. in a separate room with DVD cameras. She explained to M.A. that she would ask her some questions and that a nurse would give her a check-up, and she attempted to build a rapport with introductory questions; however, the interview quickly focused on the prior night's events:

**{¶ 77}** "And who takes care of you?

**{¶ 78}** "A. My mom and my dad.

**{¶ 79}** "Q. Your mom and your dad take care –

{¶ 80} "A. But my dad's not at my home.

{¶ 81} "Q. Your dad's not at your home? How come?

{¶ 82} "A. Because he got in jail.

{¶ 83} "Q. Him got in jail. Okay.  How come him got in jail? What did daddy do?

{¶ 84} "A. Nothing.  He just got in jail."

{¶ 85} Marshall continued asking M.A. why Arnold had gone to jail, and M.A. explained that he had done something to Wendy and that they had been fighting. M.A. also stated that Arnold had locked the bedroom door and that neither she nor Wendy were in the room, but upon further questioning, M.A. revealed that she had been in the bedroom with Arnold sleeping on the bed.

{¶ 86} When that line of questioning stalled, Marshall asked M.A. whether she had ever been to a doctor for a check-up.  M.A. responded "Today."  When Marshall asked why, M.A. said, "Because my legs were hurting."  Marshall did not explore the source of M.A.'s medical complaint, but instead returned the focus to Arnold's arrest:

{¶ 87} "Your legs were hurting? Okay.  Now, when daddy —  you said daddy went to jail and him not at the home, who took daddy to jail?

{¶ 88} "A. Cops.

{¶ 89} "* * *

{¶ 90} "Q. Who called the cops?

{¶ 91} "A. My mom.

{¶ 92} "Q. Why did she call the cops?

{¶ 93} "A. Because them was fighting."

{¶ 94} Marshall asked why Otto had to call the police, and continued:

{¶ 95} "I don't understand what your mom and dad were fighting about. Were they fighting about something that happened to you? Yeah? Okay.  I just

want you to tell the truth, that's all I want you to do. Okay. You are not in any trouble. Okay? I am going to tell you the truth, [M.A.], and I want you to tell me the truth. Okay? So your mom and your dad were fighting about something that happened to you.

{¶ 96} "A. I can't – I can't say it."

{¶ 97} Marshall then brought out a picture of a girl and had M.A. identity the parts of her body. She then continued questioning M.A.:

{¶ 98} "[W]hat would you do if someone touched one of your private parts? What would you do?

{¶ 99} "A. You get in trouble.

{¶ 100} "Q. Who gets in trouble?

{¶ 101} "A. Him."

{¶ 102} Upon further questioning, M.A. denied that anyone had touched or put anything in her private parts. Marshall then asked whether anyone had asked her to keep a secret:

{¶ 103} "Has your mom ever told you to keep a secret?

{¶ 104} "A. Yeah.

{¶ 105} "Q. What secret did your mom tell you to keep?

{¶ 106} "A. (Inaudible.)

{¶ 107} "Q. How about your dad? Did your dad ever tell you to keep a secret?

{¶ 108} "A. No.

{¶ 109} "Q. No? Has anyone ever told you not to tell?

{¶ 110} "A. No.

{¶ 111} "Q. No? Well, I don't understand how come there were cops at your house last night and how come you had to go to the doctor's across the street.

{¶ 112} "A. Because.

{¶ 113} "* * *

{¶ 114} "Q. Did mommy ever come in the bedroom when the door was locked when you and dad were sleeping? Did mom ever come in?

{¶ 115} "A. Oh, yeah.

{¶ 116} "Q. Yeah. What did mom see when she came in?

{¶ 117} "A. My underwear was off.

{¶ 118} "Q. Your underwear was off? Okay. How did your underwear get off?

{¶ 119} "A. Because my dad took them off.

{¶ 120} "Q. Oh, okay. And then what happened when your dad took your underwear off? Do you want to say it really fast in my ear what happened? After dad took your underwear off?

{¶ 121} "A. (Inaudible) My dad —

{¶ 122} "Q. Took your underwear off? And then what?

{¶ 123} "A. (Inaudible) and pee-pee with me.

{¶ 124} "Q. Your daddy took your underwear off and touched your pee-pee?

{¶ 125} "A. No. And was doing pee-pees.

{¶ 126} "Q. And was what?

{¶ 127} "A. Him was touching my pee-pee. But he was doing pee-pees with me. That's why he got in jail."

{¶ 128} On further questioning, M.A. explained that Arnold's "pee-pee" went inside her "pee-pee," that he had touched her "pee-pee" with his hand, that he had been on top of her while "playing pee-pees," that his "pee-pee" had

touched the outside of her "butt," and that his mouth had touched her "pee-pee."[2] Once Marshall had this information, she did not ask M.A. about any other instances of abuse or any other potential abusers, but rather remained focused on Arnold and reconfirmed this specific instance of abuse.

{¶ 129} Marshall then took M.A. to Horner, the nurse, for a physical exam. According to Horner's testimony, she would have conducted a head-to-toe examination of M.A. regardless of M.A.'s answers to Marshall's questions, but she explained that "that forensic interview guides my exam in that it lets me know whether or not I need to test the child for sexually transmitted infection." The physical exam of M.A. revealed abrasions on the hymen consistent with a penetrating injury.

{¶ 130} Based on this interview, the state charged Arnold with two counts of rape in violation of R.C. 2907.02. Over objection, the trial court found M.A. to be unavailable for trial and that her hearsay statements to Marshall were nontestimonial and admissible. The state played the video recording of the interview for the jury, which subsequently found Arnold guilty of vaginal rape. The Tenth District affirmed, holding that Marshall was not an agent of the police and that M.A.'s statements were not testimonial.

{¶ 131} We accepted Arnold's appeal to determine whether Marshall's interview elicited testimonial statements subject to the Confrontation Clause.

### The Confrontation Clause

{¶ 132} The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Prior to 2004, the Supreme Court of the United States had interpreted the Confrontation Clause to permit the state to

---

2. M.A. also said that Arnold's "pee-pee" was green, that his "butt" and a needle touched her "butt," and that his ears touched her "pee-pee," to which Marshall responded, "[M.A.], this stuff is

use the hearsay statements of a declarant who did not appear at trial if the hearsay fell within "a firmly rooted hearsay exception" or if it otherwise bore "particularized guarantees of trustworthiness." See, e.g., *Ohio v. Roberts* (1980)*,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597. Thus, statements made for purposes of medical diagnosis or treatment were admissible notwithstanding the inability of the accused to cross-examine the declarant. *White v. Illinois* (1992), 502 U.S. 346, 356-357, 112 S.Ct. 736, 116 L.Ed.2d 848, and fn. 8.

{¶ 133} In *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, however, the court recognized that the interpretation of the Sixth Amendment articulated in *Roberts* could not be reconciled with the historical underpinnings of the Confrontation Clause. It held that the Sixth Amendment "commands, not that [hearsay] evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford* at 61. Because the Sixth Amendment guarantees the accused's right to confront those who "bear testimony," the Confrontation Clause bars admission of testimonial statements unless the witness appears at trial or, if the witness is unavailable, the accused had a prior opportunity for cross-examination. Id. at 51. The court explained that "[w]hatever else the term ['testimonial'] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id. at 68.

{¶ 134} The Supreme Court revisited the issue in *Davis v. Washington* (2006), 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court held, "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They

---

important."

are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis* at 822. The court held that statements to a 9-1-1 operator made during a police interrogation conducted in response to an ongoing emergency are nontestimonial; however, statements made to police after the emergency had ended are testimonial.

### *Stahl, Muttart,* and *Siler*

{¶ 135} This court has previously applied *Crawford* and *Davis* to determine whether statements admitted at trial were testimonial or nontestimonial.

{¶ 136} In *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, we considered whether statements made by a rape victim to a DOVE-unit nurse in the presence of a police officer were testimonial. There, we "adopt[ed] the 'objective witness' test in Ohio. For Confrontation Clause purposes, a testimonial statement includes one made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " Id. at ¶ 36, quoting *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177. We concluded that the victim's statements to the nurse were nontestimonial because the victim could reasonably have assumed that repeating to a nurse or other medical professional the same information provided to police served a separate and distinct medical purpose from the criminal investigation. Id. at ¶ 46.

{¶ 137} Following *Stahl*, in *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, we examined the issue whether a child's statements to a social worker at the Child Maltreatment Clinic at Mercy Children's Hospital in Toledo were testimonial. We held that "[s]tatements made to medical personnel for purposes of diagnosis or treatment are not inadmissible under

*Crawford*, because they are not even remotely related to the evils that the Confrontation Clause was designed to avoid." Id. at ¶ 63. We also noted that "[t]he fact that the information gathered by the medical personnel in this case was subsequently used by the state does not change the fact that the statements were not made for the state's use." Id. at ¶ 62. Notably, however, law enforcement had not been involved in the interview or examination.

**{¶ 138}** The court distinguished *Stahl* in *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, and, relying on *Davis*, held that the primary-purpose test applies to a child declarant's statements made to police or those determined to be police agents: " '[Statements] are testimonial when the circumstances objectively indicate that there is no * * * ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.' " Id. at ¶ 30, quoting *Davis v. Washington*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court rejected the argument that because of a child's limited understanding of the system of criminal justice, the child could not reasonably expect his or her statements to be used at a later trial, and therefore, the child's statements to police interrogators are nontestimonial under the primary-purpose test.

**{¶ 139}** Our cases applying *Crawford* and *Davis* thus recognize the use of different standards when the interviewer is an agent of law enforcement and when the interviewer is an agent of a medical provider. When the questioner is an agent of law enforcement, the court, in accordance with *Siler,* looks to whether the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. When the questioner is a medical professional not related to law enforcement, the court, following *Stahl,* applies the objective-witness test and determines whether the circumstances would lead an

objective witness reasonably to believe that the statement would be available for use at a later trial.

*The Majority's Dual-Capacity Test*

{¶ 140} Today's majority, however, charts a course different from the Confrontation Clause jurisprudence of the Supreme Court of the United States and adopts its own dual-capacity test in which the interrogation is examined on a question-by-question basis to determine whether the interviewer acted as an agent of law enforcement or as an agent of some other entity when eliciting a particular statement. Applying this test, it finds that testimonial and nontestimonial statements are interspersed throughout Marshall's interview and that Marshall acted variously as an agent of law enforcement and as a medical examiner. This analysis is contrary to United States Supreme Court jurisprudence, which directs that we should look to the *primary* purpose of the interrogation, not the secondary or tertiary purpose.

{¶ 141} Here, Marshall acted as an agent of law enforcement when she interviewed M.A., as she asked questions on behalf of the police in the absence of an ongoing emergency to establish or prove past events relevant to later criminal prosecution. The interview she conducted focused solely on confirming the single instance of sexual abuse that Wendy had accused Arnold of committing: the child's medical history went no further than the night before, Marshall did not ask M.A. about any prior instances of sexual abuse she had experienced, and Marshall did not evaluate whether it would be safe to return the child to live with Wendy. Further, as the majority explains, "the interview was rather formal, more akin to the videotaped, planned interview of *Crawford* than to the frantic 9-1-1 call or the sequestered but spur-of-the-moment interview recounted in *Davis*." Majority opinion at ¶ 35.

{¶ 142} The majority therefore properly holds that M.A.'s statement that Arnold locked the bedroom door with her inside, her descriptions of where her mother and brother were and what Arnold's boxer shorts and "pee-pee" looked like, and her statements that Arnold had removed both his and her underwear are testimonial because "[t]hese statements likely were not necessary for medical diagnosis or treatment. Rather, they related primarily to the state's investigation." Majority opinion at ¶ 34.

{¶ 143} Yet the majority determines that Marshall acted as an agent of medical providers when she asked questions in any way relevant to medical diagnosis and treatment, so that the statements that "described the acts that Arnold performed, including that Arnold touched her 'pee-pee,' that Arnold's 'pee-pee' went inside her 'pee-pee,' that Arnold's 'pee-pee' touched her 'butt,' that Arnold's hand touched her 'pee-pee,' and that Arnold's mouth touched her 'pee-pee,' were thus necessary for the proper medical diagnosis and treatment of M.A." According to the majority, "[i]n eliciting these medically necessary statements, Marshall acted as an agent of the nurse practitioner who examined M.A., not of the investigating police officers." Majority opinion at ¶ 40.

{¶ 144} In my view, it is not enough that these statements were relevant for medical diagnosis; rather, the question is whether the totality of the circumstances *objectively indicate* that the *primary purpose* of the interview was to facilitate medical diagnosis and treatment or whether it was to establish or prove past events potentially relevant to later criminal prosecution.

{¶ 145} It is manifest that Marshall's questions sought to confirm the allegations of sexual abuse and that proving these past events would be relevant at a criminal prosecution, and the totality of the circumstances indicates that the whole interview served primarily an investigative and prosecutorial purpose. Notably, M.A. revealed the abuse in response to a series of questions asking why

her parents were fighting, why the police had come to her house, and why Arnold had gone to jail, and M.A. stated that Arnold "was doing pee-pees" with her and that "[t]hat's why he got in jail."

{¶ 146} Thus, M.A.'s recorded statements "are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' " *Melendez-Diaz v. Massachusetts* (2009), ___ U.S. ___, 129 S.Ct. 2527, 2532, 174 L.Ed.2d 314, quoting *Davis*, 547 U.S. at 830, 126 S.Ct. 2266, 165 L.Ed.2d 224. Her statements share the same " 'striking resemblance' of the *Crawford* statement to civil-law *ex parte* examinations" that the court recognized in *Davis*: Marshall separated M.A. from her mother for the interview but not for the physical exam, M.A. "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed," and the interview occurred after the incident and any related exigencies had ended. *Davis* at 830. Further, the CCFA perpetuated the interview for trial.

{¶ 147} The fact that the answers to Marshall's questions may also be used for a nontestimonial purpose does not mean that M.A.'s statements are not testimonial or that the nontestimonial purpose takes precedence. As the Eighth Circuit Court of Appeals explained in *United States v. Bordeaux* (C.A.8, 2005), 400 F.3d 548, 556, "That [the child's] statements may have also had a medical purpose does not change the fact that they were testimonial, because *Crawford* does not indicate, and logic does not dictate, that multi-purpose statements cannot be testimonial." Accord *State v. Henderson* (2007), 284 Kan. 267, 293, 160 P.3d 776, ("while one purpose of the interview was to enable some assistance to [the child victim], the circumstances of this case objectively indicate that its primary purpose was to establish past events potentially relevant to a later criminal prosecution of Henderson"); *State ex rel. Juvenile Dept. of Multnomah Cty. v. S.P.* (2009), 346 Or. 592, 624, 215 P.3d 847 (recognizing that statements to a child-

abuse-evaluation team served dual purposes of providing treatment to the victim and obtaining evidence against the accused, but holding that "statements in a formal setting, in response to structured questions about past events" asked by persons who were proxies for law enforcement, were testimonial).

{¶ 148} Contrary to the majority's assertion, *Davis* does not support the proposition that "[t]here is no basis in the law for concluding that Marshall's dual capacity renders statements made by M.A. for the purpose of medical diagnosis and treatment inadmissible pursuant to the Confrontation Clause." Majority opinion at ¶ 41. Rather, the United States Supreme Court in *Davis* emphasized that it had *not* held that "a conversation which begins as an interrogation to determine the need for emergency assistance cannot, as the Indiana Supreme Court put it [in *Hammon v. State*], '*evolve into testimonial statements*,' 829 N.E.2d, at 457, once that purpose has been achieved." (Emphasis added.) *Davis*, 547 U.S. at 828, 126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 149} However, by the majority's reckoning, the *converse* occurred here: an interrogation eliciting testimonial statements (i.e., that Arnold locked the door and pulled down M.A.'s underwear) evolved into a conversation to obtain medically necessary statements (i.e., Arnold raped the child). Further, the United States Supreme Court in *Davis* did not perform the question-by-question analysis that the majority undertakes in this case; rather, the court focused on whether the totality of the circumstances indicate that "the primary purpose *of the interrogation* is to establish or prove past events potentially relevant to later criminal prosecution." *Davis* at 822.

{¶ 150} In my view, the primary purpose of Marshall's questioning was to establish what had been done to M.A. and who had done it. Accordingly, M.A.'s statements are testimonial and their admission at trial without a prior opportunity

to cross-examine M.A. violated Arnold's right to confront the witnesses against him.

**{¶ 151}** Tellingly, this view that statements elicited by interviewers cooperating with law enforcement are testimonial is supported by the weight of authority addressing similar circumstances. See, e.g., *Bordeaux*, 400 F.3d at 556; *People v. Sisavath* (2004), 118 Cal.App.4th 1396, 1402, 13 Cal.Rptr.3d 753; *State v. Hooper* (2007), 145 Idaho 139, 146, 176 P.3d 911; *In re Rolandis G* (2008)*, 232 Ill.2d 13, 32-33, 327 Ill.Dec. 479, 902 N.E.2d 600; *State v. Bentley* (Iowa 2007), 739 N.W.2d 296, 302; *State v. Henderson* (2007), 284 Kan. 267, 293, 160 P.3d 776; *Hartsfield v. Commonwealth* (Ky.2009), 277 S.W.3d 239, 245; *State v. Justus* (Mo.2006)*, 205 S.W.3d 872; *State v. Blue,* 2006 ND 134, 717 N.W.2d 558, at ¶ 17-18; *State v. Mack* (2004)*, 337 Or. 586, 593, 101 P.3d 349.

**{¶ 152}** The Confrontation Clause ensures that "evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Maryland v. Craig* (1990), 497 U.S. 836, 845-846, 110 S.Ct. 3157, 111 L.Ed.2d 666. Because the principal evil at which the Confrontation Clause is directed is the use of ex parte examinations as evidence against the accused such as occurred in this case, I would reverse the judgment of the court of appeals.

---

Ron O'Brien, Franklin County Prosecuting Attorney, and Kimberly Bond, Assistant Prosecuting Attorney, for appellee.

Yeura R. Venters, Franklin County Public Defender, and David L. Strait, Assistant Public Defender, for appellant.

Vorys, Sater, Seymour & Pease, L.L.P., Lisa Pierce Reisz, and Melissa J. Mitchell, urging affirmance for amici curiae Nationwide Children's Hospital and the Center for Child and Family Advocacy.

Richard Cordray, Attorney General, Benjamin C. Mizer, Solicitor General, Elisabeth A. Long, Deputy Solicitor, and Rebecca L. Thomas, Assistant Solicitor, urging affirmance for amicus curiae Attorney General of Ohio.

Timothy Young, Ohio Public Defender, and Kelly K. Curtis, Assistant Public Defender, urging reversal for amicus curiae Ohio Public Defender.

Ian N. Friedman & Associates, Ian N. Friedman, and Eric C. Nemecek, urging reversal for amicus curiae Ohio Association of Criminal Defense Lawyers.

_____